Raed AGHA, Plaintiff,

v.

**RATIONAL SOFTWARE CORPO-RATION, a Delaware corporation, Defendant.**

No. CIV.02–107–KI.

United States District Court,
D. Oregon.

Feb. 28, 2003.

Richard C. Busse, Scott N. Hunt, Portland, for Plaintiff.

Allyson S. Krueger, Barran Liebman, LLP, Portland, William E. Hannum, III, Schwartz Hannum PC, Andover, MA, for Defendant.

## OPINION

KING, District Judge.

Plaintiff Raed Agha, of Arab descent, brings a discrimination action against his former employer, Rational Software Corporation, alleging disparate treatment and hostile work environment following the events of September 11, 2001. Before the court is defendant's motion for summary judgment (# 34) and defendant's motion to strike (# 51). For the following reasons, defendant's motion to strike is granted in part and denied in part, and defendant's motion for summary judgment is granted in its entirety.

## FACTS

Plaintiff Raed Agha was hired by defendant Rational Software Corporation in Au-

gust 2000. Plaintiff was interviewed and hired by Sales Manager Nora Drake and the Senior Manager of Telesales, Jill Linzi Cooper. Plaintiff was hired as a Corporate Account Representative ("CAR"), which is also referred to as a Telesales Representative, in Rational's Beaverton Office.

A CAR works as part of an Account Team, together with another CAR, two software engineers and an Account Executive who works outside of the office as a sales representative in the Account Team's territory.

As a CAR, plaintiff was responsible for inside sales, including making telephone calls, initially identifying incoming prospects for outside sales people, and closing smaller deals. As an Account Team member, a CAR's job is to "qualify" leads by speaking with potential customers and determining whether an on-site visit from an Account Executive would be the appropriate way for Rational to facilitate the sale. A CAR plays an integral role in the entire team's success in attaining its goals.

Each Account Team has a Team Quota that it is required to fill each quarter. The Team Quota includes a Product and Initial Maintenance ("PIM") quota, which refers to the amount of new product sold and maintenance records required to implement the product.

CARs are instructed that they are expected to perform in accordance with Rational's Five Field Measures included in the Proposed Goals for Telesales' Reps. The Five Field Measures are: "Bookings," which is essentially revenues generated; "Customer Success," which involves understanding each customer's situation and helping the customer see how Rational's products and services may fit that customer's needs; "Team Contribution," which includes participating in team meetings, and qualifying leads for Account Executives; "Territory Growth," which involves selling to new customers; and "Business Basics," which includes punctuality, preparedness for meetings and other general sales skills.

Pursuant to the Five Field Measures, plaintiff was required to meet his sales goal and track his progress toward his sales goal throughout each quarter. Plaintiff's personal goals were usually set at 30—40 % of his Account Team's PIM quota. Plaintiff states that he did not understand that he was absolutely required to meet these numbers and track his progress. Plaintiff perceived them to be "goals," rather than more rigid personal quotas.

As a Sales Manager, it was Drake's responsibility to supervise the Telesales Team in the Beaverton Office.

Early on in plaintiff's employment he had a conversation with Drake during which he stated that he was thinking of taking additional English courses and other business and marketing courses. Plaintiff asked Drake whether Rational would pay for such courses. She stated that Rational would pay for the courses and that she thought it was a good idea for plaintiff to take them.

In early January and February 2001, Chris Yates, plaintiff's Account Executive, complained to Drake about plaintiff's performance. Yates' comments largely concerned plaintiff's poor grammar, inconsistent use of fonts and spelling errors, as well as a lack of understanding of Rational's policies and procedures. Yates also expressed concern about plaintiff's ability to properly qualify customers and close sales deals that Yates perceived to be basic transactions. Both Yates and Drake worked with plaintiff primarily through verbal coaching to address these problems.

In April 2001 plaintiff was placed on a new Account Team, with a new Account

Executive, Nancy Crawford. Crawford expressed similar concerns about plaintiff's performance. Crawford discussed her concerns with her District Manager, Chris Murray, who suggested she continue to work with Drake to help plaintiff improve. Drake and Crawford continued to coached plaintiff about these performance issues.

CARs were routinely ranked by the Sales Manager with respect to meeting the Five Field Measures. Rational's numbers show that during certain rankings, plaintiff performed well in discrete areas for which he was measured. For example, plaintiff won the July revenue contest in the Beaverton Office. He had turned in the most purchase orders and generated more revenue than any representative in the office during the last five days of July. As of August 30, 2001 plaintiff was second in the office "against quota" in one of the five categories for which the CARs were ranked.

However, in the overall rankings, defendant was frequently at or near the bottom. In May 2001, plaintiff was ranked 17 of 20; in June 2001, plaintiff was ranked the lowest of all CARs in Beaverton; and in August 2001, plaintiff was ranked 18 of 21 CARs in the Western Sales Region.

Although plaintiff acknowledges that he received various coachings and ongoing mentoring from several supervisors prior to the events of September 11, 2001, plaintiff felt that he had a good relationship with Drake and his other co-workers and supervisors prior to that date, and that Drake had been complimentary of his performance to him and to others on several occasions.

After September 11, 2001, plaintiff perceived there to be a difference in the way in which Drake treated him. Plaintiff observed that she was nervous around him, "closed" to him, and no longer interested in his culture. Plaintiff's co-workers Tom Favara and Kim Silva state that Drake was less friendly and laudatory of plaintiff's performance following September 11, 2001.

Plaintiff also states that he had a difficult time getting Drake to meet with him and discuss his performance post-September 11, 2001. There were, however, several ongoing dialogues during the month of October 2001 between Drake and plaintiff via email regarding his performance. Plaintiff admits that some of Drake's suggestions via email were helpful and were evidence of a "normal relationship between the manager and employee."

On October 9, 2001 Cooper and Drake placed plaintiff on a Performance Improvement Plan ("PIP"). PIPs are part of Rational's Progressive Discipline Policy. According to the policy, a supervisor should give two written notices if performance did not correct after general counseling. Despite the fact that this was Rational's written policy, many people were terminated for poor performance following several coachings and only one written warning. At least five people in plaintiff's region, the Western Sales Region, had been terminated with only one written warning. Plaintiff received only one formal written notice, the PIP itself.

Defendant explains that it placed plaintiff on a PIP in an effort to correct plaintiff's performance problems. The PIP was based on a template that Rational had used for another employee in the past and was modified to set specific goals for plaintiff. The PIP was drafted by Drake, but was reviewed and edited by Jill Cooper, Senior Manager of Telesales, and Andy Franklin, a Human Resources staffperson.

The PIP stated that failure to meet the goals set out in the PIP within thirty days would result in employment termination. When plaintiff was placed on the PIP he perceived the terms of it to be fair and did not interpret his placement on the PIP as

discriminatory. Plaintiff believed he was already doing what the PIP required and was just going to "go back and do it."

At the time plaintiff was placed on the PIP, he was the only person in the Beaverton office on such a plan. One person, Tom Favara, was rated the same as plaintiff during the August rankings, but was not placed on a plan. Favara had been employed for a longer period of time than plaintiff and had previously done quite well, but was seriously ill during the time period at issue, which was the reason no action was taken on his performance.

Two other individuals in the region, Kent Ferris and Kristen Chiaramonte, were rated the same or lower than plaintiff in the August rankings. Ferris was put on a PIP and his employment was terminated in November 2001. Chiaramonte was not put on a PIP, nor was she terminated. However, after the August, 2001 ranking, Chiaramonte was removed as a CAR and demoted to a lower position.

At some point after September 11, 2001, but prior to plaintiff's termination, plaintiff and Drake had a conversation regarding plaintiff's use of the English language. The specific interaction took place in the broader context of Drake and plaintiff discussing plaintiff's need to improve his sales performance. Plaintiff states that Drake told him he was no longer to speak Arabic at work and no longer to hang around his Arab friends. Drake believes there to have been a miscommunication, in that she intended to simply expressed concern about his English skills because communication skills are critical to being a telesales representative. Drake states she did not intend to forbid him to speak Arabic, but rather intended to help determine how he was going to improve his English skills when the only time he spoke English was during limited hours at work. She remembered having had an earlier conversation with plaintiff about the possibility of taking additional English courses.

Plaintiff spoke with Andy Franklin of Human Resources regarding his conversation with Drake and his perceived treatment by her. Plaintiff told Andy Franklin that he believed he was meeting the goals of his PIP, but that Drake disagreed. He also discussed with Franklin the portion of his conversation with Drake wherein he thought she forbade him to speak Arabic. Franklin explained to plaintiff that he may possibly have misunderstood what Drake meant, but that he would follow-up with her to be sure.

Franklin discussed the issue with Drake and again called plaintiff and explained what Drake stated she meant by her comments-that plaintiff needed to improve his communication skills. Franklin understood plaintiff to have been satisfied with that explanation. Plaintiff perceived Drake to have become even more critical and "hostile" toward him after he contacted Franklin.

Plaintiff also contacted Jill Cooper to discuss his PIP. Plaintiff told Cooper that he did not believe he was being treated fairly by Drake and that she was not recognizing his efforts.

At the end of the PIP period, Cooper and Drake agreed that plaintiff did not meet all of the goals set out in the PIP. For example, plaintiff was required to generate $60,000 in PIM sales during the PIP period, but generated only $31,000 in sales. Also, plaintiff failed to deliver a business driver questionnaire on time, failed to update his "dashboard" tracking mechanism on a daily basis, and failed to deliver his weekly progress reports as expected.

During the entire time plaintiff was at Rational, he never met his personal sales goals for any given quarter and his Account Team never met its team quota.

Every other CAR in the Beaverton office met both of these goals at least once during the time frame of plaintiff's employment at Rational.

On November 9, 2001, plaintiff's employment was terminated. Plaintiff's territory was given to Jacob Korngold, a non-Arab individual.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.), *cert. denied*, 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999).

## DISCUSSION

### I. *Defendant's Motion to Strike*

Defendant moves to strike large portions of the declarations submitted by plaintiff for hearsay, lack of personal knowledge, inadmissible opinion testimony, and testimony inconsistent with deposition testimony.

#### A. *Plaintiff's Declaration*

Defendant's motion to strike plaintiff's declaration is based largely on defendant's argument that plaintiff's declaration flatly contradicts his deposition.

Affidavits which are inconsistent with prior deposition testimony given by the affiant should be stricken if the court makes a factual determination that the contradictory matter is actually a "sham" and not the result of an honest discrepancy, a mistake, or the result of newly discovered evidence. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir. 1991). A party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543–44 (9th Cir.1975). ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

With respect to paragraph 3 (page 1, lines 1 through 8), paragraph 7 (page 2, lines 3 through 4) of plaintiff's declaration, I deny defendant's motion. In these lines plaintiff declares that he received no negative feedback about his performance prior to September 11, 2001. Although this is a close call, I find that these statements are not directly contradictory to plaintiff's prior deposition testimony. I note, however, that in plaintiff's response to defendant's Concise Statement of Material Facts, plaintiff admits that he received mentorings and coachings from Drake, Crawford, and Yates.

■ With respect to paragraph 5 (page 2, lines 1 through 3) of plaintiff's declaration, I deny defendant's motion. In these lines of his declaration plaintiff states that Drake was not personally helpful to him after September 11. In his deposition plaintiff admits that he and Drake exchanged helpful emails once he was on his PIP. I do not find these statements to be contradictory, however, because in plaintiff's deposition he explained that he had a difficulty getting Drake to sit down and spend time with him face-to-face, but that

email communications sometimes worked as a way of corresponding with her. Therefore I do not find plaintiff's statement that Drake was not *personally* helpful to be a sham.

■ With respect to paragraph 9 (page 2, lines 2 through 5, and line 8) of plaintiff's declaration, I deny defendant's motion. In these lines plaintiff states that although at the time he thought he could meet the PIP requirements, in retrospect, it would have been difficult to do so. This paragraph is not in direct contradiction with plaintiff's deposition and simply states that in retrospect he has changed his view of the task he was faced with. I cannot say that this is a sham because plaintiff could have gotten this new retrospective view subsequent to his deposition. Moreover, I do not find plaintiff's statement here to be inadmissible lay opinion testimony. Plaintiff is simply stating his perception of his ability to reach the goals given to him.

■ With respect to paragraph 10 (page 2, lines 1 through 4) of plaintiff's declaration, I deny defendant's motion. These lines state that plaintiff did not have general discussions with Nancy Crawford about his improvement and she was not critical to him. Defendant does not argue that this portion of plaintiff's declaration is contradictory to plaintiff's prior deposition; instead, defendant argues the court should strike these lines from plaintiff's declaration because they are contradictory to Nancy Crawford's deposition filed in support of defendant's motion for summary judgment. This is not a valid basis for a motion to strike. If anything, this contradiction would support a finding that there is an issue of fact as to what interactions occurred between plaintiff and Crawford. However, I conclude that the differences between plaintiff's declaration and Crawford's deposition are more accurately characterized as a difference in understanding

of whether Crawford was in fact "critical" of plaintiff's performance. I find that whether their interactions should be considered "general discussions," as Crawford contends and plaintiff disputes, is immaterial.

**B. *Tareq Abuadas' Declaration***

■ Defendant moves to strike paragraph 3 (page 1, lines 1 through 2, and page 2, lines 3 through 4) and paragraph 4 (page 2, lines 4 through 6) of Abuadas' declaration. In these lines Abuadas describes statements made by Nora Drake and by Chris Murray with respect to plaintiff's performance. Defendant argues that these statements are hearsay insofar as they are offered to proof the truth of the matter asserted-that plaintiff was performing well. I deny plaintiff's motion to strike these paragraphs because these statements are admissible as admissions by a party opponent under Fed.R.Evid. 801(d)(2)(D).

**C. *Tom Favara's Declaration***

■ Defendant objects to portions of Favara's declaration wherein he describes his observations of the relationship between plaintiff and Drake after September 11, 2001. Defendant argues that Favara lacks personal knowledge and that these statements are inadmissable lay opinion testimony. I disagree. Favara is simply relaying his observations. I deny defendant's motion to strike paragraph 3 (page 2, lines 1 through 6) and paragraph 5 (page 2, lines 1 through 3) of Favara's declaration.

■ Defendant also objects to certain portions of Favara's declaration wherein he relates what plaintiff said to him regarding speaking Arabic and what Drake said to another over the telephone. I disagree with defendant that these statements constitute inadmissable opinion tes-

timony. I agree that the statement by plaintiff regarding speaking Arabic is inadmissible hearsay, and I grant defendant's motion with respect to paragraph 4 (page 2, lines 1 through 3). I find that Favara's statement regarding Drake's telephone conversation is admissible as an admission, and I deny defendant's motion with respect to paragraph 6 (page 2, lines 13 through 15).

### D. *Kim Silva's Declaration*

■ Defendant objects to one line in Silva's declaration wherein Silva states that Drake offered more praise to plaintiff before September 11, 2001 than after. As with the Favara declaration, Silva is simply stating her observations as a co-worker who observed their interactions. I deny defendant's motion to strike paragraph 4 (page 2, line 1) of Silva's declaration.

### II. *Disparate Treatment*

Plaintiff alleges disparate treatment based on race, in violation of Title VII of the Civil Rights Act and Oregon law. In moving for summary judgment, defendant argues that plaintiff cannot establish a prima facie case of discrimination, and even if plaintiff could, he cannot rebut defendant's non-discriminatory explanation for plaintiff's termination.

To prove a Title VII disparate treatment claim, a plaintiff must establish a prima facie case of discrimination. A prima facie case may be demonstrated by direct evidence of discriminatory intent or may be based on a presumption arising from factors set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). Generally stated, the factors are: (1) membership in a protected class; (2) qualification for the job or satisfactory performance of the job; (3) an adverse employment decision; and (4) different treatment than those similarly situated outside of the protected class. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

The requisite degree of proof necessary to establish a prima facie case for a Title VII claim on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis*, 26 F.3d at 889. "The plaintiff need only offer evidence which 'gives rise to an inference of unlawful discrimination.' ... Establishment of a prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* (citations omitted). Once plaintiff has established a prima facie case, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating some permissible reason for the adverse action. *Id.* "Once the defendant fulfills this burden of production by offering a legitimate, nondiscriminatory reason for its employment decision, the ... presumption of unlawful discrimination 'simply drops out of the picture.'" *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

The burden then shifts to the plaintiff to show that the defendant's reason is a pretext for another motive which is discriminatory. *Id.* "When evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal *prima facie* case based on a McDonnell Douglas type presumption." *Id.* at 890–91. Plaintiff's own assertion of superior qualifications is insufficient without additional evidence. *Blue v. Widnall*, 162 F.3d 541, 546 (9th Cir.1998). Plaintiff is not required, however to produce additional, independent evidence of discrimination at the pretext stage if the prima facie case raises a genuine issue of material fact regarding the truth of the employer's proffered reasons. *Chuang v. University of*

*California Davis,* 225 F.3d 1115, 1127 (9th Cir.2000).

### A. *Plaintiff's Prima Facie Case*

■ Of the prima facie elements, the only two at issue are whether plaintiff was adequately qualified for his job and whether plaintiff was treated differently than similarly situated individuals outside of the protected class.

Defendant argues that plaintiff cannot make the requisite showing that he was adequately qualified for his job because there is specific evidence of plaintiff's subpar performance. Defendant points to the fact that plaintiff was ranked near the bottom of the performance list for telesales representatives in his office, that he never met his personal sales goals and that his team never met their team goals. Plaintiff points to other evidence that indicates he was performing at basically an average and adequate level, and during some periods of time was doing quite well. For example, plaintiff won the July revenue contest in the Beaverton office and received praise for doing so.

Defendant's argument on this issue seems to place a higher burden on plaintiff than is required for a prima facie showing. In a recent case, the Ninth Circuit cautioned against "conflating the minimal inference [of job qualification] needed to establish a prima facie case with the specific, substantial showing [plaintiff] must make at the third stage of the *McDonnell Douglas* inquiry to demonstrate that [defendant's] reasons for laying him off were pretextual." *Aragon v. Republic Silver State Disposal, Inc.,* 292 F.3d 654, 659 (9th Cir.2002). In *Aragon,* the Ninth Circuit reversed the district court for having required the plaintiff in that case to show that he was doing well enough to eliminate the possibility that he was laid off for job performance reasons. *Aragon,* 292 F.3d at 659. I find that plaintiff has made the requisite prima facie showing that he was qualified for his position. I will consider defendant's arguments regarding plaintiff's job performance in analyzing defendant's explanation for plaintiff's termination and in determining whether plaintiff has met his burden of showing pretext.

■ Defendant next argues that plaintiff cannot establish a prima facie case because he has not shown that he was treated differently than similarly situated individuals outside of the protected class. Defendant argues that plaintiff was not treated differently than similarly situated non-Arab individuals because, although no others were terminated when plaintiff was, no other individuals had the performance deficiencies that plaintiff did.

Based on Rational's August 2001 rankings, the last rankings prior to plaintiff's being placed on a PIP and terminated, two other non-Arab telesales representative received the same point total as plaintiff, and one other was rated lower than plaintiff. Of the three people ranked at the same level or below plaintiff, although plaintiff mischaracterizes how they were treated, plaintiff correctly notes that two of them were not fired, as plaintiff was.

As I noted above regarding the prima facie showing of plaintiff's qualifications, I think defendant blurs the minimal showing needed at the prima facie stage with the burden-shifting that follows. I find that plaintiff has submitted sufficient evidence to meet the minimal prima facie case that he was treated differently than similarly situated members outside of his protected class. I will consider defendant's arguments as to why the other low-ranked individuals were not disciplined in the same manner as plaintiff in the context of defendant's burden to provide a non-discriminatory reason and plaintiff's burden to show this is pretextual.

## B. Defendant's Explanation for Plaintiff's Termination

Because plaintiff has established a prima facie case, the burden shifts to defendant to articulate a legitimate non-discriminatory reason for its decision to terminate plaintiff's employment. Defendant has met this burden by alleging that plaintiff's overall low sales performance and failure to meet the requirements of the PIP were the reasons for his termination. The burden then shifts to plaintiff to show that this explanation is not credible or is pretextual.

Under federal standards, to avoid summary judgment, the plaintiff must produce enough evidence to allow a reasonable factfinder to conclude *either:* (a) that the alleged reason for the plaintiff's discharge was false, *or* (b) that the true reason for his discharge was a discriminatory one. *Nidds v. Schindler Elevator Corporation,* 113 F.3d 912, 918 (9th Cir.1996) (emphasis in the original), *cert. denied,* 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997). If the plaintiff offers direct evidence of discriminatory motive, a triable issue on the actual motivation is created "even if the evidence is not substantial." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir.1998). The plaintiff may also offer circumstantial evidence that tends to show that the proffered motive is a pretext because it is inconsistent or unbelievable. In this case, the evidence of pretext must be specific and substantial to create a triable issue on whether the employer intended to discriminate. *Id.* at 1222.

### 1. Plaintiff's Performance Compared to That of Others

 Plaintiff argues that defendant's reasons for plaintiff's termination are pretextual because Rational's numbers show that plaintiff was performing as well as or better than others who were not disciplined. In making this argument, plaintiff paints a picture that is inaccurate and incomplete. For, example, plaintiff argues that his placement on a PIP and his ultimate termination when others were allowed to remain employed during the same time period suggests pretext for discrimination. One person, Tom Favara, was rated the same as plaintiff during the August rankings, but was not placed on a plan. Rational explains that Favara had been employed for a longer period of time than plaintiff and had previously done quite well, but was seriously ill during the time period at issue, which was the reason no action was taken on his performance. Two other individuals in the region, Kent Ferris and Kristen Chiaramonte, were rated the same or lower than plaintiff in the August rankings. Ferris was put on a PIP and his employment was terminated in November 2001. Chiaramonte was not put on a PIP, nor was she terminated. However, after the August 2001 ranking, Chiaramonte was removed as a CAR and demoted to a lower position.

Plaintiff cannot simply rely on the fact that three people were ranked at or below his level and were not treated in the exact same manner. First, in doing this, plaintiff ignores the fact that two of the three were in fact disciplined. Moreover, plaintiff must make a showing that defendant's reasons for the difference in discipline steps are pretextual. He has not done so with respect to these three individuals.

Plaintiff attempts to use other Rational rankings and performance figures to paint the picture that plaintiff was doing well at Rational compared to others. In several sections of plaintiff's brief, he compares one of his own highest sales months with another worker's lowest month, while ignoring the bigger picture of how each worker did throughout the course of his or her employment. For example, plaintiff characterizes his performance as exceed-

ing Kim Silva's. Plaintiff does so by showing that in the second quarter of FY2002, plaintiff achieved 47% of his goal whereas Silva only achieved 45% of hers. However, plaintiff compares his performance to Silva's in the *only* quarter in which Silva did not meet her goal, whereas plaintiff *never* met his goal.

Defendant's decision to place plaintiff on a PIP and ultimately terminate his employment was made by looking at plaintiff's performance over the entire period of his employment. Plaintiff cannot refute defendant's evidence that plaintiff was the only CAR in the Beaverton office who never met his personal sales goal and plaintiff was the only CAR in the Beaverton office whose Team never achieved its Team PIM Quota. Moreover, plaintiff's PIP requirements included several other non-sales related measures, which plaintiff had struggled with throughout the course of his employment and failed to meet during the PIP period.

### 2. The Timing of the Disciplinary Actions Taken Against Plaintiff

Plaintiff also attempts to show pretext by arguing that his performance issues were not addressed until after September 11, 2001. Plaintiff's argument here is contrary to plaintiff's admissions in response to defendant's Concise Statement of Material Facts and fails in light of evidence submitted by defendant. Both of plaintiff's Account Executives, Chris Yates and Nancy Crawford, testified that prior to September 11, 2001, plaintiff struggled with performance issues. They both discussed their concerns with their supervisors and tried to help plaintiff improve. Defendant submits email documentation of several of these communications, which all occurred prior to September 11, 2001. Whether plaintiff perceived these to have been "complaints" about him is irrelevant. Plaintiff acknowledges that he received coachings from several individuals. Moreover, the fact that plaintiff was given praise for having achieved certain discrete accomplishments prior to September 11 does not show that there were no concerns about his overall performance issues before that date.

### 3. The Steps Leading to Plaintiff's Termination

Plaintiff argues that defendant failed to follow its own policy with regard to terminating employees. According to the Progressive Discipline Policy defendant had in place at the time, a supervisor was supposed to give two written notices if performance did not correct after general counseling. Despite the fact that this was Rational's written policy, many people were terminated for poor performance following several coachings and only one written warning. At least five people in plaintiff's region, the Western Sales Region, had been terminated with only one written warning. As discussed further below, the decision to place plaintiff on a PIP was made by three individuals who worked together to draft the plan after having concluded that the general counselings plaintiff had received did not result in performance improvement. Because defendant submits evidence that suggests this was the very process followed for most terminations despite the company's written policy, I find plaintiff's argument here unconvincing.

### 4. Plaintiff's Interactions with Nora Drake

Plaintiff argues that Nora Drake's treatment of plaintiff following the events of September 11, 2001 establishes pretext for discrimination. Plaintiff states that Drake told him he was not to speak Arabic in the office and was not to hang around his Arab friends. Plaintiff testified that no one at Rational other than Drake made

any comments about his race and no one else treated him differently after September 11.

Drake contends that plaintiff misunderstood the conversation at issue, and that she was simply trying to help plaintiff with a perceived deficiency in plaintiff's communication skills. Plaintiff is entitled to rely on his own declaration and I am required to view the facts in the light most favorable to plaintiff. Assuming the conversation occurred just as plaintiff describes, however, Drake's comments are in the nature of "stray comments" which are not tied to the termination decision and, thus, are not probative of discriminatory animus. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916, 918–19 (9th Cir. 1996) (reference to "old timers" is ambiguous and is not tied directly to employment action); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir.1993) (" '[w]e don't necessarily like grey hair" ' is more than a stray remark but is at best weak evidence of discriminatory animus; " '[w]e don't want unpromotable fifty-year olds around" ' was very general and did not relate in any way to the terminations).

Plaintiff's argument regarding these remarks assumes that they were in fact tied to plaintiff's termination decision. However, plaintiff's employment was terminated by Drake, in consultation with her supervisor and a human resources staffperson, both of whom plaintiff admits were not motivated by discrimination. Defendant has submitted documentation of the communications between Drake, Cooper and Franklin regarding the drafting of the PIP and defendant's ultimate conclusion that plaintiff had not met the requirements and should be terminated. Drake did not terminate plaintiff on her own.

Finally plaintiff's evidence of Drake's unfriendly treatment of him does not save this argument. Plaintiff states that Drake was more abrupt and "closed" to him after

September 11, 2001 and he had difficulty getting her to personally help him improve. Plaintiff also submits the declarations of two individuals that state she was less friendly, laudatory and "chit-chatty" with plaintiff subsequent to that date. Even assuming Drake was less friendly and open to plaintiff after the events of September 11, this is not sufficient additional evidence to turn Drake's comments regarding the Arabic language into evidence of discriminatory intent sufficient to meet plaintiff's burden.

Plaintiff relies on *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406 (9th Cir.1996), an age discrimination case, to support his argument that Drake's comments in combination with "other evidence" support a showing of pretext. The other evidence of discrimination in *Schnidrig* was considerably more substantial than plaintiff's evidence here. In *Schnidrig*, the plaintiff submitted evidence of statements by several Board members, including in affidavits, that showed age was a criteria in the hiring process. The plaintiff also submitted evidence that the age requirement was discussed at Board meetings. Plaintiff's evidence of Drake's unfriendliness falls far short of what the Ninth Circuit considered in *Schnidrig*. This is true, particularly in light of defendant's evidence of email communications during the month of October, 2001 wherein Drake provided suggestions for plaintiff's improvement. Plaintiff admitted that these emails were helpful and evidence of a "normal relationship between the manager and employee."

It is clear to me from the evidence submitted by both parties that plaintiff was a hard-worker with a good attitude with respect to improving himself. It is also clear to me that plaintiff failed to meet the expectations of him. Plaintiff's perception of what occurred may be based on his good faith belief that he was putting a consider-

able effort into his job. The uncontested numbers, rankings, and email communications regarding plaintiff's performance simply tell a different story. Plaintiff has very little evidence with respect to his performance compared to others to support any showing of pretext, and the remarks by Drake and her coldness toward him are simply insufficient to show that defendant's explanation of plaintiff's termination is a pretext for discrimination. Accordingly, I grant defendant's motion for summary judgment with respect to plaintiff's disparate treatment claim.

### III. *Hostile Work Environment*

█ In addition to his disparate treatment claim, plaintiff brings a claim alleging that defendant's discrimination based on plaintiff's race created a hostile or abusive work environment. Defendant argues that plaintiff has not made the requisite showing of hostile work environment to withstand its motion for summary judgment. I agree.

Plaintiff's hostile work environment claim is based largely on Drake's comment about speaking Arabic and her unfriendly and unhelpful treatment of him following September 11, 2001. In support of his argument, plaintiff states that once his review began and Drake was being rather unresponsive, he went to others to complain, once to Cooper, and twice to Franklin. Plaintiff argues that the steps he took show that the work environment was hostile.

To prove that a hostile environment existed, a plaintiff must show "(1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Pavon v. Swift Transp., Co., Inc.,* 192 F.3d 902, 908 (9th Cir.1999) (citing *Meritor Savings Bank, FSB v. Vinson* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). The working environment must both subjectively and objectively be perceived as abusive. *Fuller v. City of Oakland, Calif.,* 47 F.3d 1522, 1527 (9th Cir.1995). Whether a workplace is objectively hostile is determined based on the totality of the circumstances from the perspective of a reasonable person with the same fundamental characteristics as the plaintiff. *Id.*

Courts have found no hostile work environment existed with considerably more evidence than that which plaintiff has submitted here. *See, e.g., Sanchez v. City of Santa Ana,* 936 F.2d 1027 (9th Cir.1990) (holding no reasonable jury would have found a hostile work environment despite allegations that employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, did not provide adequate backup to Latino police officers, provided unsafe vehicles to Latino Officers, and kept illegal personnel files on plaintiffs because they were Latinos). Plaintiff has failed to cite a single case in which a court has found sufficient evidence of a hostile work environment based on similar allegations as those made by plaintiff. Even assuming plaintiff can show that Drake made an offensive comment with regard to his speaking Arabic and that she was generally less friendly and less helpful following the events of September 11, 2001, these interactions do not rise to the level of abusive or hostile, nor do they appear to have been sufficiently pervasive. Plaintiff even admitted in his deposition that he would take his job back at Rational, despite the fact that he is earning more money at his new job. Because I find that plaintiff has failed to establish triable issues about the existence of a hostile work environment, I grant defendant's motion for summary judgment on this claim.

## CONCLUSION

For the foregoing reasons defendant's motion to strike (# 51) is granted in part and denied in part, and defendant's motion for summary judgment (# 34) is granted in its entirety.