[No. B222539. Second Dist., Div. One. Dec. 30, 2010.]

ARNOLD GREENSPAN, as Trustee, etc., Plaintiff and Appellant, v. LADT LLC et al., Defendants and Respondents.

488

 

COUNSEL

Bingham McCutchen, Daniel Alberstone, Peter F. Smith; Greines, Martin, Stein & Richland, Robin Meadow, Jeffrey E. Raskin, Gary J. Wax; Baron & Budd and Daniel Alberstone for Plaintiff and Appellant.

Leonard, Dicker & Schreiber, Richard C. Leonard, Steven A. Schuman; Horvitz & Levy, David S. Ettinger and Jason R. Litt for Defendants and Respondents.

OPINION

**MALLANO, P. J.**—A real estate developer created several limited liability companies to supervise his various construction projects. The developer transferred ownership of the companies to a trust, chose his brother as the trustee, and acted as the "manager" of the companies.

Plaintiff filed suit against two of the companies, alleging a claim for breach of contract, among others. Plaintiff sued the manager on different claims, such as breach of fiduciary duty but not breach of contract. The case was arbitrated. At the time of the arbitration, one of the companies had recently received more than $47 million in property sales. Plaintiff prevailed against the two companies for breach of contract. The manager prevailed on the claims against him. The arbitrator awarded plaintiff $8.45 million against the companies.

The trial court, Judge Robert L. Hess presiding, confirmed the arbitration award and entered judgment accordingly. The companies unsuccessfully appealed. (*Greenspan v. LADT, LCC* (2010) 185 Cal.App.4th 1413 [111 Cal.Rptr.3d 468] (*Greenspan I*).)

Meanwhile, the $47 million had dwindled to less than $13,000. The two companies appeared to be judgment proof. Plaintiff commenced proceedings to satisfy the judgment. After conducting judgment debtor examinations, plaintiff filed a motion to amend the judgment to add the manager, the trustee, and two other affiliated companies as judgment debtors, relying on the alter ego doctrine. (See Code Civ. Proc., § 187; undesignated section references are to that code.)

The trial court, Judge Joanne B. O'Donnell presiding, denied the motion. First, the court held it would be inequitable to add the manager as a judgment debtor because he had been a party to the arbitration and had prevailed. Second, the trial court concluded that alter ego principles do not apply in the

trust context, precluding the addition of the trustee. Last, the trial court sustained multiple objections to plaintiff's exhibits, excluding most of his evidence.

We conclude it would not always be inequitable to add as a judgment debtor a party who prevailed in an arbitration. Rather, it would depend on the facts of the case. Here, the manager was not sued for breach of contract and did not prevail on that claim. The judgment is based on a claim to which he was not a party. The addition of the manager as a judgment debtor would not constitute a finding that he breached the companies' contract but would instead serve to remedy his alleged disregard of the companies' separate existence. Second, we determine that although a *trust* is not subject to the alter ego doctrine because it is not a legal entity, a *trustee* may be added as a judgment debtor. Last, with two exceptions, the trial court erred in sustaining the objections to plaintiff's evidence. We therefore reverse the order denying the motion to amend the judgment.

# I

# BACKGROUND

The allegations and facts on this appeal are taken from the complaint, the record in the arbitration proceeding, and the papers and exhibits submitted in connection with the motion to amend the judgment.

## A. *Parties' Contract*

Barry Shy (Shy) is a real estate developer who worked with Andrew Meieran (Meieran) to renovate the Higgins Building in downtown Los Angeles. For that purpose, they formed a company, LADT LLC (LADT). LADT was jointly owned by (1) LABAR LLC (LABAR), another of Shy's companies, and (2) the Andrew Meieran Family Trust (Meieran Trust or Trust).

In 1998, LADT purchased the Higgins Building and started to convert the dilapidated structure, built in 1910, from an office building into apartments. In 2003, Shy, who managed LADT and LABAR, proposed to convert the Higgins Building into loft-style residential condominiums, with commercial units on the ground floor.

The goal of the Meieran Trust was to develop and operate historic bars. In pursuit of that goal, the trustee, Arnold Greenspan, decided to sell the Trust's interest in LADT to Shy and to acquire commercial space on the ground floor of the Higgins Building, where the Trust would later build the Edison Bar.

On August 20, 2004, the Meieran Trust sold its interest in LADT to a new company created by Shy—LA ABC, LLC (LA ABC)—in exchange for $7.75 million and title to six commercial units in the Higgins Building, valued at $3.5 million altogether. The terms of the transaction were recited in a "Purchase Agreement," which stated that the agreement was "entered into . . . by and between Arnold Greenspan, Trustee of the Andrew Meieran Family Trust u/a/d 12/19/03 . . . (the 'Seller'), and LA ABC, a California limited liability company (the 'Purchaser')."

Section 6 of the Purchase Agreement addressed *LADT*'s obligations under the agreement, stating: "LADT hereby consents to the terms of this Agreement, including, without limitation, the provisions of . . . Section 4. LADT shall cooperate with the parties hereto and take all actions and execute any agreements and other documents necessary to effectuate the transactions contemplated by this Agreement, including, without limitation, the transactions set forth in . . . Section 4, as necessary." Section 4 stated that LA ABC would indemnify the Trust for any breach of the Purchase Agreement by LA ABC and that the Trust would indemnify LA ABC with respect to any breach by the Trust.

The Purchase Agreement was signed by Greenspan as trustee of the "Seller"—the Meieran Trust—and by Shy as manager of the "Purchaser"—LA ABC. For its part, LADT "acknowledged and agreed . . . to Section 6" of the Purchase Agreement, with Shy signing twice, first as manager of LADT and then individually. Meieran signed the Purchase Agreement as a member of LADT. The agreement did not contain an arbitration provision.

In 1998, Shy had created the BR Shy Irrevocable Trust (Shy Trust) for the benefit of his children. He transferred ownership of LA ABC and LABAR to the trust. As a result of the Purchase Agreement, LA ABC and LABAR became the owners of LADT, and LADT, too, became the property of the Shy Trust. Shy chose his brother, Moti Shai, to serve as the trustee.

During the construction phase of the Higgins Building project, Shy and Meieran had a number of disagreements. They argued about walls that had been moved, trash areas, parking spaces, and storage spaces. In the midst of the squabbling, LA ABC failed to make a payment to the Meieran Trust that was due under the Purchase Agreement.

In an attempt to settle their disputes, Shy and Meieran participated in a mediation on September 26, 2005. The mediation resulted in a handwritten document drafted by the mediator, which Shy and Meieran signed. The document contained a list of 10 items to be provided or completed by

LA ABC. It concluded: "This is the agreement between the parties with regard to the purchase of LADT by LA ABC [from the] Andrew Meieran [Family] Trust . . . . The parties hereby agree that LA ABC will do or perform or pay these items in exchange for release from the [Meieran] Trust with respect to this purchase ([of] the Higgins Building), and as full satisfaction of the obligation of LA ABC with regard to the tenant improvements. [¶] Any dispute as to the interpretation of this agreement shall be submitted to mediation, failing which, shall be submitted to binding arbitration." (We will refer to the handwritten document as the Arbitration Agreement.)

## B. *Complaint*

On August 10, 2006, Greenspan, as trustee of the Meieran Trust, filed this action against LADT, LA ABC, and Shy (defendants). The complaint alleged as follows.

LA ABC had failed to pay more than $4.2 million of the purchase price for the Meieran Trust's interest in LADT. LA ABC had also interfered with the Trust's use of parking spaces and storage space in the Higgins Building.

The complaint asserted seven causes of action: (1) rescission of the Purchase Agreement, against LA ABC and LADT; (2) breach of the Purchase Agreement, against LA ABC; (3) breach of guaranty, against Shy; (4) breach of fiduciary duty, against Shy; (5) accounting, against all defendants; (6) conversion, against all defendants; and (7) constructive trust, against all defendants.

## C. *Petition to Compel Arbitration*

On September 22, 2006, defendants filed a petition to compel arbitration and stay the action pending the outcome of arbitration. According to the petition, the Arbitration Agreement required the parties to arbitrate disputes related to the Purchase Agreement. Greenspan filed opposition papers, contending (1) the Meieran Trust was not a party to the Arbitration Agreement because Andrew Meieran—not Greenspan, the trustee—had signed the agreement, and (2) the Arbitration Agreement did not encompass the causes of action in the complaint.

By order dated January 11, 2007, the trial court, Judge Robert L. Hess presiding, found that "the parties have entered into a valid agreement to submit disputes regarding the Higgins Building initially to mediation and thereafter to binding arbitration. [¶] . . . Plaintiff is to initiate mediation, and defendants are to cooperate in that initiation. Should mediation be unsuccessful, the parties are to attempt to agree upon an arbitrator. If the parties are unable to agree, the Court on application will select an arbitrator."

The parties failed to resolve their disputes through mediation and proceeded with selecting an arbitrator. They chose retired Judge Keith Wisot, in association with JAMS.

Preliminary proceedings in the arbitration, including conferences and motion hearings, began in March 2007 and continued for several months. At a status conference on March 7, 2007, the parties agreed that the arbitration would be governed by "JAMS Comprehensive Arbitration Rules & Procedures."

"In March 2007, the parties executed an 'Agreement[] Concerning Hold Instructions,' which required the arbitrator to decide how to dispose of certain funds belonging to LADT. The funds were generated by LADT's sale of two condominiums in the Higgins Building. At some point, the [Meieran] Trust had recorded a lis pendens against those units, preventing the closing of escrow. The [Meieran] Trust eventually removed the lis pendens, allowing the units to be sold, in exchange for LADT's promise to hold the sales proceeds for disposition by the arbitrator. The agreement concerning hold instructions (Hold Funds Agreement) stated: 'Whereas, on or about March 9, 2007, Arnold Greenspan, as Trustee of the Andrew Meieran Family Trust, and Barry Shy, as managing member of LADT LLC, executed Hold Instructions for the seller's net proceeds concerning Units 906 and 1001 of the Higgins Building in order to allow the sales of these Units to be closed.

" 'The Undersigned hereby agree that they will execute Mutual Instructions ("Instructions"), on or before April 30, 2007, to Mara Escrow. These Instructions will provide that Mara Escrow will transfer the monies held in its interest bearing account, pursuant to the Hold Instructions, to a joint blocked account designated by the undersigned parties. Said account will be opened by the undersigned parties in an institution that is FDIC insured. The account will be [a] blocked account and the institution will receive instructions that the funds may only be released to a person or entity designated by Judge Wisot in his final award in [the Higgins Building arbitration].

" 'The parties hereby waive any right to challenge, in court or otherwise, any order to release these funds as set forth in Judge Wisot's final award.' " (*Greenspan I, supra*, 185 Cal.App.4th at p. 1427.)

The "Hold Funds Agreement" was signed by Shy as manager of LADT and by Greenspan as trustee of the Meieran Trust.

During the arbitration proceeding, Greenspan learned that LADT had recently received more than $47 million from the sale of condominiums in the Higgins Building.

## D. *Interim and Final Arbitration Awards*

On June 13, 2008, the arbitrator rendered an "Interim Award." As to the Meieran Trust's claims, the arbitrator found LA ABC liable on the second cause of action, for breach of contract, and awarded the Trust $6,338,566.89 in damages. The Trust failed to prove its other claims. With respect to the issues raised by the Hold Funds Agreement, the arbitrator stated: "The funds in escrow (including any interest earned) are . . . the property of LADT, for distribution under its current operating agreement. However, in an exercise of equitable discretion in fashioning this Award, the arbitrator now directs the funds are to remain in escrow until the award . . . is fully satisfied."

"The Interim Award concluded: 'This Award disposes of all substantive issues raised in this arbitration. [The Meieran Trust] is the prevailing party, and entitled . . . to recover attorney fees and costs . . . . [¶] This is an Interim Award, however, because the arbitrator retains jurisdiction in several particulars: [¶] . . . [¶] [(1)] to include within the award attorney fees and costs, including JAMS fees; [¶] [(2)] to reopen the hearing, if requested by [the Trust] . . . ; [¶] [(3)] to consider modification of the Disposition of Funds Held in Escrow, or *equitable remedies, if any, available against* [*defendants*] *other than LA ABC for satisfaction of the award*[.] . . . [¶] The parties are directed to submit briefs and declarations on the matters reserved for further consideration pursuant to the [established] schedule[.] [¶] . . . [¶] Unless the arbitrator determines to reopen the hearing, or to schedule further argument based on the submissions, the Final Award will issue no later than August 1, 2008.' . . . On June 16, 2008, JAMS served the Interim Award on the parties." (*Greenspan I, supra*, 185 Cal.App.4th at p. 1431, italics added & omitted.)

"On June 30, 2008, the [Meieran] Trust submitted a 'Request to Reopen Hearing.' The Trust argued that, under section 6 of the Purchase Agreement, LADT was jointly and severally liable for payments owed by LA ABC, including all damages. (See pt. I.A., *ante*, quoting Purchase Agreement, § 6.) The Trust also relied on the Hold Funds Agreement: 'Since LA ABC's only asset was its interest in LADT, it had no funds to make the payments to the [Meieran] Trust. . . . [¶] . . . [¶] . . . [T]he Trust will be forced to pursue LADT to recover the balance owed under the final award. No purpose would be served by having the funds remain in escrow. To the contrary, it is only fair and just that the Arbitrator include in the final award an express order that the funds be released to the [Meieran] Trust as partial satisfaction of the award.' " (*Greenspan I, supra*, 185 Cal.App.4th at p. 1431.)

On July 14, 2008, defendants submitted a brief in opposition to the request to reopen hearing, addressing the issue of LADT's joint and several liability.

They "asserted that such liability would not be rationally derived from the Purchase Agreement, citing *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 383 [36 Cal.Rptr.2d 581, 885 P.2d 994], and '[that the Trust] has no grounds to "pursue" LADT for LA ABC's debts. Under no circumstances can LADT be held liable for LA ABC's obligations. . . . [The Trust] argue[s] that no point would be served in LADT being allowed to keep its own money. The points that would be served include complying with the Purchase Agreement, the laws of California and the Due Process clause of the United States Constitution.' " (*Greenspan I, supra*, 185 Cal.App.4th at p. 1432.)

"In a reply brief submitted on July 25, 2008, the [Meieran] Trust emphasized that the arbitrator could grant any remedy or relief that was just and equitable: 'Under California law, an arbitrator enjoys the authority to fashion relief that he considers just and fair so long as the remedy may be "rationally derived" from the contract and the breach. [*Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th at page] 383. Here, both of the rulings that the [Meieran] Trust seeks are "rationally derived" from the parties' agreements. The Purchase Agreement—which LADT executed—required LADT to "take all actions . . . necessary to effectuate.the transactions contemplated by [the] Agreement . . . ." . . . LADT thus had the contractual duty to make the payments due under the Purchase Agreement in the event that LA ABC failed to do so. Therefore, the remedy of holding LADT jointly and severally liable for payments is rationally derived from the Purchase Agreement itself. Likewise, an order directing the disbursement of funds held in escrow to the [Meieran] Trust as partial satisfaction of the award is rationally derived from both the Purchase Agreement <u>and</u> the [Hold Funds Agreement]. This latter agreement expressly states that the funds in escrow will be disbursed to a person or entity designated by the Arbitrator in his Final Award . . . . Under California law, . . . the Arbitrator has authority to find LA ABC and LADT jointly and severally liable, and to direct that the funds in escrow be distributed to the Trust.' " (*Greenspan I, supra*, 185 Cal.App.4th at pp. 1432–1433.)

On August 1, 2008, the arbitrator rendered a "Final Award." It "reiterated the terms of the Interim Award virtually verbatim and went on to say: '[The Meieran Trust] has demonstrated by a preponderance of evidence its entitlement to an award for breach of contract against LA ABC. In [the Trust's] request to reopen the hearing, [it] reviews evidence previously presented as the basis for rendering a final award on this cause of action jointly and severally against LA ABC and LADT. As [the Trust] points out, section 6 of the Purchase Agreement sets forth the specific consent of LADT to all terms of the Agreement, and further mandates LADT to "cooperate with the parties hereto and take all actions and execute any agreements and other documents necessary to effectuate the transactions contemplated by this Agreement. . . ."

In fact, the evidence demonstrates that payments on the Purchase Agreement were made by LADT. . . . LADT by Shy, was a signator[y] to acknowledge its obligations under section 6 [of] the Purchase Agreement. . . .

" 'Both sides rely on *Advanced Micro Devices, Inc. v. Intel Corp.*[, *supra*,] 9 Cal.4th 362 in arguing whether the award should include LADT and find joint and several liability with LA ABC. Under that case, the arbitrator is authorized, when circumstances warrant, to fix a remedy for breach of contract that is flexible, creative, and based on fairness. "In private arbitrations, the parties have bargained for the relatively free exercise of those faculties. Arbitrators, unless specifically restricted by the agreement to follow legal rules, may base their decision upon broad principles of justice and equity. . . ." . . . *Id.* at 374–375.

" 'The agreement between the parties to this arbitration contains no restriction to "dry law," or legal rules. In the circumstances here, LA ABC has only one asset: its membership in LADT. It is apparently without resources to pay the award for breach of contract. Further, the evidence is clear that Shy has exclusive control over each of his entities, and that he pays little attention to which account is used to make payments on the Purchase Agreement. . . . [T]he arbitrator finds that LADT had a full opportunity and did in fact present its evidence in connection with payments on the Purchase Agreement. [Defendants'] arguments that joint and several liability violate[s] due process rights of another Shy entity, LABAR, or LADT's creditors, [are] rejected. Under the circumstances here, the arbitrator finds the remedy sought by [the Meieran Trust] is rationally derived from the Purchase Agreement and its breach. Joint and several liability with LA ABC simply implements LADT's obligation to effectuate the transactions of the Purchase Agreement.' " (*Greenspan I, supra*, 185 Cal.App.4th at pp. 1433–1434.) The arbitrator denied the Trust's request to reopen the hearing.

"Regarding the Hold Funds Agreement, the arbitrator found '[t]he parties stipulated the arbitrator is to determine disposition of the proceeds of sale from two units sold, where the proceeds have been held in escrow pending this arbitration. . . . No criteria were presented to guide the arbitrator's determination, but only that the funds are to be released to the person or entity designated by the arbitrator in the final award. Further, [the Meieran Trust] quotes a letter agreement that the parties "waive any right to challenge, in court or otherwise, any order to release these funds as set forth in Judge Wisot's final award." . . . [The Trust's] request for enforcement of that agreement was deferred until the final award. [¶] [The Trust] has not been successful in obtaining rescission of the Purchase Agreement. The funds in escrow (including any interest earned) are . . . the property of LADT. However, in an exercise of equitable discretion in fashioning this Award, and

because this award sets forth joint and several liability of LADT and LA ABC, the arbitrator now directs: [¶] (1) On [the Trust's] written notice to escrow, to LADT and LA ABC, that the funds will apply in partial discharge of this award, escrow is to release the funds directly to [the Trust] within 3 business days of notice, and notwithstanding escrow instructions that may remain unfulfilled; [¶] (2) If no notice is given, escrow is to continue to hold the funds until [the Trust] gives written notice that the award has been fully satisfied. Only if the award is satisfied, escrow is then directed to release the funds directly to LADT.' " (*Greenspan I, supra*, 185 Cal.App.4th at p. 1434.)

"In concluding the Final Award, the arbitrator stated: 'Arnold Greenspan, as Trustee of the Andrew Meieran Family Trust, is to recover from . . . LA ABC, a California Limited Liability Company, and LADT, LLC, a California Limited Liability Company, jointly and severally: [¶] the amount of $6,534,605.66 as compensatory damages on the contract. This amount shall bear further interest at $1,298.27 per day until entry of judgment; [¶] the amount of $1,546,478 in attorney fees; [¶] the amount of $368,215.86 in costs; [¶] for a total recovery of $8,449,299.40.' " (*Greenspan I, supra*, 185 Cal.App.4th at pp. 1434–1435.)

### E. *Postarbitration Petitions*

On August 13, 2008, defendants petitioned the trial court to vacate the award. On behalf of the Meieran Trust, Greenspan filed a petition to confirm. On October 16, 2008, the trial court, Judge Robert L. Hess presiding, heard argument on the cross-petitions, granted the petition to confirm, denied the petition to vacate, and entered an order to that effect. Judgment was subsequently entered in favor of Greenspan, as trustee, for $8.8 million based on the arbitration award, interest, costs of suit, and attorney fees. LADT and LA ABC appealed (*Greenspan I*).

### F. *Prior Appeal (Greenspan I)*

In the earlier appeal, LADT argued the arbitrator had erred in determining it was jointly and severally liable on the breach of contract claim. We rejected that argument, stating: " 'Judicial review of [arbitral] remedies . . . looks not to whether the arbitrator correctly *interpreted* the agreement, but to whether the award is drawn from the agreement *as the arbitrator interpreted it* or derives from some extrinsic source. . . . [W]here an arbitrator is authorized to determine remedies for contract violations, "courts have no authority to disagree with his honest judgment in that respect. . . . [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." ' . . .

" 'Arbitrators are not obliged to read contracts literally, and an award may not be vacated merely because the court is unable to find the relief granted was authorized by a specific term of the contract. . . . The remedy awarded, however, must bear some rational relationship to the contract and the breach. The required link may be to the contractual terms as actually interpreted by the arbitrator (if the arbitrator has made that interpretation known), to an interpretation implied in the award itself, or to a plausible theory of the contract's general subject matter, framework or intent. . . . The award must be related in a rational manner to the breach (as expressly or impliedly found by the arbitrator). . . .

" 'The award will be upheld so long as it was even arguably based on the contract; it may be vacated only if the reviewing court is *compelled* to infer the award was based on an extrinsic source. . . . In close cases the arbitrator's decision must stand.' . . .

" 'The award is rationally related to the breach if it is aimed at compensating for, or alleviating the effects of, the breach.' . . .

" '[A]rbitrators, unless expressly restricted by the agreement of the parties, enjoy the authority to fashion relief they consider just and fair under the circumstances existing at the time of arbitration, so long as the remedy may be rationally derived from the contract and the breach.' . . .

"As pertinent here, JAMS Rule 24(c) provides: '[T]he Arbitrator shall be guided by the rules of law and equity that the Arbitrator deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' agreement . . . .' This type of rule 'has been described as "a broad grant of authority to fashion remedies" . . . and as giving the arbitrator "broad scope" in choice of relief.' . . .

" '. . . "Arbitrators have broad discretion in fashioning a remedy for the injustice which is found to have occurred." . . . "[A]n arbitration panel may grant equitable relief that a Court could not." ' . . . 'Equitable relief is by its nature flexible . . . .' . . .

"LADT contends the arbitrator's finding of joint and several liability was not rationally related to the Purchase Agreement. Assuming that such 'liability' is a 'remedy' for purposes of *Advanced Micro Devices, Inc. v. Intel Corp., supra,* 9 Cal.4th 362, we disagree.

"The arbitrator interpreted section 6 of the Purchase Agreement in deciding that LADT was jointly and severally liable for breach of that agreement. Section 6 provided: 'LADT hereby consents to the terms of this Agreement,

including, without limitation, the provisions of . . . Section 4. LADT shall cooperate with the parties hereto and take all actions and execute any agreements and other documents necessary to effectuate the transactions contemplated by this Agreement, including, without limitation, the transactions set forth in . . . Section 4, as necessary.' Section 4 stated in part that LA ABC would indemnify the [Meieran] Trust for any breach of the Purchase Agreement by LA ABC. LADT signed the Purchase Agreement to acknowledge and agree to section 6.

"The arbitrator relied on LADT's obligations under section 6 of the Purchase Agreement in concluding that LADT was liable for LA ABC's failure to pay the full purchase price to the [Meieran] Trust. In essence, the arbitrator found that, under section 6, LADT had to assist LA ABC by indemnifying the Trust for LA ABC's breach of the Purchase Agreement.

"We therefore conclude the arbitrator's finding of joint and several liability was rationally related to the Purchase Agreement. It was not derived from an extrinsic source. And because the arbitrator's award of damages consisted of the unpaid portion of the purchase price, plus interest, the remedy was rationally related to the breach." (*Greenspan I, supra*, 185 Cal.App.4th at pp. 1447–1449, citations omitted.)

LADT also asserted that "the arbitrator's finding of joint and several liability rested, at least in part, on alter ego principles." (*Greenspan I, supra*, 185 Cal.App.4th at p. 1444.) We responded: "That *may* well be. . . . Nevertheless, *any* dispute about alter ego liability was . . . arbitrable. JAMS Rule 24(c) states: 'In determining the merits of the dispute the Arbitrator shall be guided by *the rules of law and equity agreed upon by the Parties*. In the *absence of such agreement*, the Arbitrator shall be guided by *the rules of law and equity that the Arbitrator deems to be most appropriate*. . . .' . . . Neither the Purchase Agreement nor the Arbitration Agreement prescribed the rules of law or equity to be applied, leaving it to the arbitrator to choose the applicable rules.

" 'The essence of the alter ego doctrine is that justice be done. "What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result." ' " (*Greenspan I, supra*, 185 Cal.App.4th at p. 1444, first & second italics added, citation omitted.)

Ultimately, we concluded the trial court had properly entered judgment on the arbitration award in favor of Greenspan. (*Greenspan I, supra*, 185 Cal.App.4th at p. 1461.)

## G. *Motion to Amend Judgment to Add Judgment Debtors*

Pursuant to the Hold Funds Agreement and other efforts to satisfy the judgment, Greenspan initially recovered around $1.1 million, leaving over $7.7 million to be collected.

To satisfy the remaining portion of the judgment, Greenspan engaged in judgment debtor discovery by (1) taking the depositions of Barry Shy, Moti Shai (the trustee of the Shy Trust), two bank representatives, and an employee of LADT; (2) serving form interrogatories on Shy, LADT, and LA ABC; and (3) subpoenaing bank records.

On August 28, 2009, Greenspan filed a motion to amend the judgment to add as judgment debtors Barry Shy, Moti Shai (as trustee of the Shy Trust), and two of Shy's companies, Harpro LLC (Harpro) and 6th St. Loft LLC (6th St. Loft) (collectively Shy parties). Greenspan submitted 39 exhibits with his moving papers. The Shy parties filed opposition. With the exception of Moti Shai, the Shy parties filed objections to 30 of Greenspan's 39 exhibits.

The motion was heard on February 5, 2010. The trial court, Judge Joanne B. O'Donnell presiding, issued a written tentative ruling denying the motion. After argument, the trial court adopted the tentative ruling as its final ruling. As a preliminary matter, the ruling addressed the objections to Greenspan's evidence, tersely stating: "No. 28 is overruled; all others are sustained. . . ." The objections were not mentioned or discussed during argument. As to adding Moti Shai as a judgment debtor in his capacity as trustee of the Shy Trust, the ruling said: "[T]he argument that Barry Shy acted on behalf of the [Shy] Trust, such that the [Shy] Trust must have alter ego liability for the judgment debtors that Barry Shy controls, is unsupported by any authority." With regard to adding Barry Shy to the judgment, the trial court concluded it could not "amend a judgment by inserting the name of a person or entity who had been a defendant to the underlying action and who was found not liable in that action. . . . [N]otwithstanding that [Greenspan] apparently did not argue the alter ego theory at the arbitration, it is undisputed that [he] had the opportunity to do so, both during the arbitration ([he] could have requested leave to amend) and after [the arbitration] was concluded. [Greenspan] will not be permitted to use an equitable doctrine to amend a judgment to name a party that [he] could have and should have litigated against as an alter ego in the underlying litigation." Finally, the court ruled that Greenspan had failed to "establish a sufficient unity of interest between LA ABC and LADT, on the one hand, and 6th St. Loft and Harpro, on the other hand." In addition, 6th St. Loft and Harpro did not have "the requisite control of the previous litigation and were [not] virtually represented in the litigation." "[T]here [was] no evidence that [Barry] Shy was considering the other entities while in control of the underlying litigation."

On February 5, 2010, the same day as the hearing, the trial court entered an order denying the motion. Greenspan, on behalf of the Meieran Trust, filed this appeal.

# II

## DISCUSSION

Barry Shy contends he cannot be added as a judgment debtor because he was a party to the arbitration and prevailed. But he fails to understand that the judgment is based on the claim that LA ABC and LADT breached the Purchase Agreement. Shy was not a party to that claim and did not prevail on it. To add him as a judgment debtor would be based, not on a finding he breached the agreement, but on his control of the Shy Trust and its companies to such an extent that his failure to satisfy the judgment would promote injustice. Nor was Greenspan under any obligation to pursue Shy as an alter ego in the arbitration given that he did not suspect Shy controlled a unitary enterprise consisting of the Shy Trust and the limited liability companies. Further, at the time of the arbitration, LADT had just received more than $47 million from condominium sales in the Higgins Building—more than enough to satisfy the judgment on the arbitration award of $8.8 million.

The Shy Trust maintains, as did the trial court, that no authority supports the application of alter ego principles in the trust context. That is incorrect. Under prevailing authority, Moti Shai, as trustee of the Shy Trust, may be added as a judgment debtor to provide creditors with access to the trust's assets.

6th St. Loft and Harpro argue there was insufficient evidence to establish they were alter egos of Shy's other companies, LADT and LA ABC. That may have been a consequence of the trial court's erroneous exclusion of most of Greenspan's evidence. In addition, if the evidence shows that Shy dominated the Shy Trust and its companies and that he disregarded their separate existence, he would not be expected—though the trial court thought differently—to "consider[] the other entities[, 6th St. Loft and Harpro,] while in control of the underlying litigation." Rather, he would have been considering a *single enterprise*, not its component parts.

A. *Addition of Judgment Debtors*

Section 187 states: "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this

Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code."

■ "Under section 187, the trial court is authorized to amend a judgment to add additional judgment debtors. . . . As a general rule, 'a court may amend its judgment at any time so that the judgment will properly designate the real defendants.' . . . Judgments may be amended to add additional judgment debtors on the ground that a person or entity is the alter ego of the original judgment debtor. . . . 'Amendment of a judgment to add an alter ego "is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant. . . . 'Such a procedure is an appropriate and complete method by which to bind new . . . defendants where it can be demonstrated that in their capacity as alter ego of the corporation they in fact had control of the previous litigation, and thus were virtually represented in the lawsuit.' . . ." . . .' " (*Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd.* (1996) 41 Cal.App.4th 1551, 1554–1555 [49 Cal.Rptr.2d 286], citations & fn. omitted; accord, *NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 778 [256 Cal.Rptr. 441]; *Carr v. Barnabey's Hotel Corp.* (1994) 23 Cal.App.4th 14, 20–22 [28 Cal.Rptr.2d 127].) "The decision to grant an amendment in such circumstances lies in the sound discretion of the trial court. 'The greatest liberality is to be encouraged in the allowance of such amendments in order to see that justice is done.' " (*Carr v. Barnabey's Hotel Corp.*, at p. 20.)

### 1. Judgment on Arbitration Award

The Shy parties contend that a *judgment* entered on an arbitration award should not be subject to amendment under section 187 because an *arbitrator* loses jurisdiction to amend an *award* after it is confirmed. (See *Law Offices of David S. Karton v. Segreto* (2009) 176 Cal.App.4th 1, 10 [97 Cal.Rptr.3d 329]; §§ 1286, 1286.4, 1286.6, 1286.8.) We disagree for two reasons.

First, the judgment in this case is governed by section 1287.4, which provides: "If an [arbitration] award is confirmed, judgment shall be entered in conformity therewith. The judgment so entered has the same force and effect as, and is *subject to all the provisions of law relating to, a judgment in a civil action* . . . ; and it may be enforced like any other judgment of the court in which it is entered . . . ." (Italics added.)

Second, the differential treatment urged by the Shy parties—applying section 187 to court judgments but not to arbitration judgments—would improperly favor the enforcement of court decisions over arbitration awards, raising serious questions about the statute's validity under the Federal

Arbitration Act (FAA) (9 U.S.C. §§ 1–16). (See *Hedges v. Carrigan* (2004) 117 Cal.App.4th 578, 583–585 [11 Cal.Rptr.3d 787]; *Basura v. U.S. Home Corp.* (2002) 98 Cal.App.4th 1205, 1212–1215 [120 Cal.Rptr.2d 328].) And large-scale construction projects often involve interstate commerce, making the FAA applicable. (See, e.g., *Garrison v. Palmas Del Mar Homeowners Assn., Inc.* (D.P.R. 2008) 538 F.Supp.2d 468, 474; *C. P. Robinson Construction Co. v. National Corp. for Housing Partnerships* (M.D.N.C. 1974) 375 F.Supp. 446, 451; *Sears Roebuck and Co. v. Glenwal Co.* (S.D.N.Y. 1970) 325 F.Supp. 86, 89–90, affd. (2d Cir. 1971) 442 F.2d 1350.)

### 2. *Control of Litigation and Virtual Representation*

■ To add the Shy parties as judgment debtors, Greenspan must show that, *in the Shy parties' capacity as alter egos*, they controlled the arbitration and were virtually represented in that proceeding. Due process "guarantees that any person against whom a claim is asserted in a judicial proceeding shall have the opportunity to be heard and to present his defenses." (*Motores De Mexicali v. Superior Court* (1958) 51 Cal.2d 172, 176 [331 P.2d 1].) There is no dispute that Barry Shy directed the defense of the arbitration— and vigorously so—on behalf of LADT, LA ABC, and himself. If Greenspan can establish that Shy dominated a single enterprise consisting of the Shy Trust and its companies, including 6th St. Loft and Harpro, the requisite control of the arbitration and the virtual representation of the proposed judgment debtors will be necessarily established.

■ Section 187 does not require that the proposed judgment debtors "themselves, technically [have been] given the opportunity to convince" the arbitrator they should have prevailed in the arbitration. (*NEC Electronics Inc. v. Hurt, supra*, 208 Cal.App.3d at p. 779.) Here, it would be sufficient if "in effect . . . [Barry Shy, Moti Shai, 6th St. Loft, and Harpro] are identical [to LA ABC and LADT]; . . . the action was fully and fairly tried . . . ; and . . . nothing appears in the record to show that [the proposed judgment debtors] could have produced a scintilla of evidence that would have in any way affected the results of the [arbitration] . . . ." (*Id.* at p. 780.) In light of the requirements that the proposed judgment debtors have had control of the underlying litigation and have been virtually represented, it is something of a misnomer to say that section 187 provides a " 'method by which to bind *new* . . . defendants [to the judgment].' " (*NEC Electronics*, at p. 778, italics added; accord, *Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd., supra*, 41 Cal.App.4th at p. 1555.) More accurately, the statute " 'properly designate[s] the *real* defendants.' " (*Hall, Goodhue, Haisley & Barker, Inc.*, at p. 1555, italics added; accord, *NEC Electronics*, at p. 778.) Simply put, section 187 recognizes "the inherent authority of a court to make its records speak the truth." (*Mirabito v. San Francisco Dairy Co.* (1935) 8 Cal.App.2d 54, 57 [47 P.2d 530].)

■ The alter ego doctrine is premised on the theory that the person in charge of a single enterprise consisting of several alter ego entities is typically concerned with the *total amount* of his assets held by all entities, not with the specific amount held by any particular one. If Shy viewed and treated all entities as a unitary enterprise, he would not have considered their "distinct" interests during the arbitration because, as far as he was concerned, their interests were identical to his own. If, at some point, Shy wanted to protect the funds of a particular entity, he could make a transfer to another entity. And as the head of a single enterprise, Shy would have controlled the arbitration on behalf of the entities as a group and actually—not just virtually—represented them all. Although section 187 may not apply if the alter egos have different interests, Shy's interests were the same as those of his trust and companies; there were no relevant conflicts within the alleged single enterprise. (See *Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 152–153 [46 Cal.Rptr.3d 7]; *NEC Electronics Inc. v. Hurt, supra*, 208 Cal.App.3d at pp. 780–781.)

## B. *Alter Ego Doctrine*

■ As the United States Supreme Court explained over 60 years ago: "Normally the corporation is an insulator from liability on claims of creditors. The fact that incorporation was desired in order to obtain limited liability does not defeat that purpose. . . . Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted. But there are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied. . . . [A] surrender of that principle of limited liability would be made 'when the sacrifice is so essential to the end that some accepted public policy may be defended or upheld.' . . . '[T]he courts will not permit themselves to be blinded or deceived by mere forms or law' but will deal 'with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require.' We are dealing here with a principle of liability which is concerned with realities not forms." (*Anderson v. Abbott* (1944) 321 U.S. 349, 361–363 [88 L.Ed. 793, 64 S.Ct. 531], citations omitted.)

■ "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. . . . In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation: 'As the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted. When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so

that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation.' . . .

■ "There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case. There are, nevertheless, two general requirements: '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' . . . And 'only a difference in wording is used in stating the same concept where the entity sought to be held liable is another corporation instead of an individual.' . . .

". . . [W]hen a court disregards the corporate entity, it does not dissolve the corporation. 'It is often said that the court will disregard the "fiction" of the corporate entity, or will "pierce the corporate veil." Some writers have criticized this statement, contending that the corporate entity is not a fiction, and that the doctrine merely limits the exercise of the corporate privilege to prevent its abuse.' . . .

■ "In *Kohn* v. *Kohn* (1950) 95 Cal.App.2d 708 [214 P.2d 71], a marriage dissolution case, the question was whether the husband's corporation was the alter ego of the husband so that its income should have been included in the determination of his liability. The court explained the alter ego doctrine: 'The issue is not so much whether, for all purposes, the corporation is the "alter ego" of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether in the particular case presented and for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form.' . . . 'In the instant case there may well have been various business reasons sufficient to justify and support the formation or continuation of the corporation on the part of defendant. For such purposes the [corporation] still stands.' . . . However, to the extent the purpose of the corporation was to fraudulently deprive the wife of a fair property settlement, the corporate entity would be disregarded: 'The law of this state is that the separate corporate entity will not be honored where to do so would be to defeat the rights and equities of third persons.' . . .

■ "The essence of the alter ego doctrine is that justice be done. '. . . [L]iability is imposed to reach an equitable result.' . . . Thus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300–301 [216 Cal.Rptr. 443, 702 P.2d 601], citations omitted.)

" 'The law as to whether courts will pierce the corporate veil is easy to state but difficult to apply.' . . . Because it is founded on equitable principles, application of the alter ego [doctrine] 'is not made to depend upon prior decisions involving factual situations which appear to be similar. . . . "It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case." ' . . . Whether the evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when supported by substantial evidence." (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1248 [1 Cal.Rptr.2d 301], citations omitted.)

 " 'Usually, a disregard of the corporate entity is sought in order to fasten liability upon individual stockholders. . . . "A very numerous and growing class of cases wherein the corporate entity is disregarded is that wherein it is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of *another corporation*." . . .' . . .

"Because society recognizes the benefits of allowing persons and organizations to limit their business risks through incorporation, sound public policy dictates that imposition of alter ego liability be approached with caution. . . . Nevertheless, it would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds with impunity. . . .

 "Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies. The theory has been described as follows: ' "In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it. The court thus has constructed for purposes of imposing liability an entity unknown to any secretary of state comprising assets and liabilities of two or more legal personalities; endowed that entity with the assets of both, and charged it with the liabilities of one or both.["] ' " (*Las Palmas Associates v. Las Palmas Center Associates, supra*, 235 Cal.App.3d at pp. 1249–1250, citations & some italics omitted.)

 " 'The alter ego test encompasses a host of factors: "[1] [c]ommingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses . . . ; [2] the treatment by an individual of the assets of the corporation as his own . . . ; [3] the failure to obtain authority to issue

stock or to subscribe to or issue the same . . . ; [4] the holding out by an individual that he is personally liable for the debts of the corporation . . . ; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities . . . ; [5] the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family . . . ; [6] the use of the same office or business location; the employment of the same employees and/or attorney . . . ; [7] the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization . . . ; [8] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . . ; ▇▇▇ [9] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities . . . ; [10] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities . . . ; [11] the use of the corporate entity to procure labor, services or merchandise for another person or entity . . . ; [12] the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another . . . ; [13] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions . . . ; [14] and the formation and use of a corporation to transfer to it the existing liability of another person or entity." . . . [¶] This long list of factors is not exhaustive. The enumerated factors may be considered "[a]mong" others "under the particular circumstances of each case." ' . . . 'No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine. . . .' " (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811–812 [110 Cal.Rptr.3d 597], citations omitted.)

▇▇▇ In *Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510 [77 Cal.Rptr.3d 96], the Court of Appeal held that "outside reverse" piercing of the corporate veil is not permitted in California, that is, the corporate veil will not be pierced to satisfy the debt of an *individual shareholder*. Rather, the court explained, the alter ego doctrine will only be applied to hold an individual shareholder liable for a *corporate debt* where the individual has disregarded the corporate form.

This case does not involve outside reverse piercing. Greenspan seeks to add judgment debtors to satisfy the debt of two *companies*, LA ABC and LADT. He does not argue that, under the alter ego doctrine, the Shy Trust or any of the Shy entities is liable for the debt of an *individual shareholder*.

Instead, he contends that, under the doctrine, the judgment debtors should include (1) affiliated companies of the original debtors, (2) the trustee who nominally owns the original debtors and the affiliated companies, and (3) the individual who controls a single enterprise consisting of the original debtors, the affiliated companies, and the trustee. (See *Las Palmas Associates v. Las Palmas Center Associates, supra*, 235 Cal.App.3d at pp. 1249–1250.)

## C. *Addition of Barry Shy as Judgment Debtor*

The trial court declined to add Shy as a judgment debtor on the ground he had been a party to the arbitration and had prevailed. The court went on to say that Greenspan could and should have pursued his alter ego theory against Shy in the arbitration.

The trial court's ruling sounds similar to the application of res judicata or collateral estoppel. Yet the Shy parties state on appeal that the ruling does not rest on either one. Nor do the Shy parties contend that either doctrine applies here.

Nevertheless, we cannot think of a principled basis for the trial court's ruling other than some kind of equitable rule that, at a minimum, borrows concepts from res judicata or collateral estoppel. We therefore explain why those doctrines are irrelevant in this case.

"Res judicata prohibits the relitigation of claims and issues which have already been adjudicated in an earlier proceeding. The doctrine has two components. ' "In its primary aspect the doctrine of res judicata [or 'claim preclusion'] operates as a bar to the maintenance of a second suit between the same parties on the same cause of action." . . . The secondary aspect is "collateral estoppel" or "issue preclusion," which does not bar a second action but "precludes a party to an action from relitigating in a second proceeding matters litigated and determined in a prior proceeding." ' " (*Kelly v. Vons Companies, Inc.* (1998) 67 Cal.App.4th 1329, 1335 [79 Cal.Rptr.2d 763].) "Res judicata serves as a bar to all causes of action that were litigated or that *could have been litigated* . . . . This determination is made *as of the date the first complaint is filed*. . . . [¶] Res judicata is not a bar to claims that arise after the initial complaint is filed. . . . The general rule that a judgment is conclusive as to matters that *could have been litigated* '*does not apply to new rights acquired pending the action* which might have been, but which were not, required to be litigated . . . .' " (*Allied Fire Protection v. Diede Construction, Inc.* (2005) 127 Cal.App.4th 150, 155 [25 Cal.Rptr.3d 195], italics added, citations omitted.)

Although the Shy parties disavow any reliance on res judicata or collateral estoppel in supporting the rule adopted by the trial court, their appellate brief

makes repeated references to the issues raised and resolved in the arbitration. In our view, here are the pertinent facts. Greenspan, as the trustee of the Meieran Trust, pursued causes of action against LA ABC, LADT, and Barry Shy arising out of LADT's renovation of the Higgins Building. The complaint alleged a contract claim against LA ABC based on a breach of the Purchase Agreement; LADT and Barry Shy were not parties to that claim. In addition, the complaint alleged claims for rescission of the Purchase Agreement, against LA ABC and LADT; breach of guaranty, against Shy; breach of fiduciary duty, against Shy; accounting, against all defendants; conversion, against all defendants; and constructive trust, against all defendants. Before the arbitration hearing commenced, Greenspan dismissed the claim against Shy for breach of guaranty and, during the hearing, dismissed the claim against all defendants for an accounting. In an interim award, the arbitrator found against LA ABC on the breach of contract claim. Greenspan did not prevail on any other claims. In the final award, the arbitrator concluded that LADT was jointly and severally liable with LA ABC for breach of the Purchase Agreement.

As we explained in our prior opinion, the arbitrator based his finding of joint and several liability on a provision in the Purchase Agreement (section 6) that " 'implements *LADT's* obligation to effectuate the transactions of the Purchase Agreement.' " (*Greenspan I, supra*, 185 Cal.App.4th at p. 1434, italics added.) In other words, the arbitrator determined that section 6 of the Purchase Agreement, together with principles of fairness and equity, obligated LADT to fulfill LA ABC's contractual promises. (*Greenspan I*, at pp. 1433–1434, 1448–1449.) But that did not stop LADT from arguing in the prior appeal that the arbitrator had improperly applied the alter ego doctrine in making his joint and several liability finding. (*Id.* at p. 1444.) We took no position on whether the arbitrator had applied alter ego principles but assumed he had for purposes of the appeal and then addressed LADT's alter ego arguments. (*Id.* at pp. 1444–1445.)

In fact, at no point during the arbitration did Greenspan mention "alter ego," much less argue the doctrine applied. Nor did the arbitrator refer to the doctrine in the interim or final arbitration awards. And in ruling on the motion to amend the judgment below, the trial court observed that Greenspan "apparently did not argue the alter ego theory at the arbitration." Thus, in denying the motion to amend, the trial court did not base its decision on the arbitrator's resolution of any alter ego allegations.

As for collateral estoppel, the arbitrator made these relevant findings: " 'LA ABC has only one asset: its membership in LADT. It is apparently without resources to pay the award for breach of contract. Further, the evidence is clear that Shy has exclusive control over each of his entities, and

that he pays little attention to which account is used to make payments on the Purchase Agreement.' " (*Greenspan I, supra,* 185 Cal.App.4th at pp. 1433–1434.) In addition: " '[T]he evidence demonstrates that payments on the Purchase Agreement were made by LADT' " (*id.* at p. 1433), even though the agreement obligated LA ABC to make them. We find it difficult to square these arbitral findings with the trial court's *reliance on the arbitration* as a basis for *denying* the motion to amend the judgment.

The trial court also commented that Greenspan could and should have litigated Barry Shy's alter ego status in the arbitration. But under res judicata principles, as we now explain, he had no obligation to do so. When Greenspan filed the complaint, he had no reason to believe that the alter ego doctrine might apply to Shy. Although Greenspan had a concern about *LA ABC*'s ability to satisfy a judgment, the arbitrator put that concern to rest by finding LADT jointly and severally liable on the contract claim based on equitable principles and the language in the Purchase Agreement (§ 6). During the arbitration, Greenspan knew LADT had recently received over $47 million on condominium sales in the Higgins Building. As trustee of the Meieran Trust, he was awarded $8.45 million in the arbitration. Thus, prior to the completion of the arbitration, Greenspan had no practical reason or legal obligation to pursue Shy on an alter ego theory.

█ That Shy was a party to the arbitration is beside the point. The arbitration award was against LA ABC and LADT on the breach of contract claim, as was the trial court's subsequent judgment. Shy was not a party to the contract claim and did not prevail on it. Thus, under res judicata and collateral estoppel, nothing precluded Greenspan from conducting judgment debtor examinations of Shy and his companies or from seeking to add Shy as a judgment debtor under section 187 on an alter ego theory. "A claim against a defendant, based on the alter ego theory, is not itself a claim for substantive relief, e.g., breach of contract . . . , but rather, procedural, i.e., to disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice." (*Hennessey's Tavern, Inc. v. American Air Filter Co.* (1988) 204 Cal.App.3d 1351, 1359 [251 Cal.Rptr. 859]; cf. *Katzir's Floor and Home Design v. M-MLS.com* (9th Cir. 2004) 394 F.3d 1143, 1150 [proposed judgment debtor not added pursuant to § 187, in part because he was *not* a named party in underlying suit].)

█ Adding Barry Shy as a judgment debtor under section 187 is unrelated to the liability determinations made in the arbitration, more specifically, liability for breach of contract. The remedy provided by section 187 is simply a means of satisfying a judgment against individuals and companies

that have ignored each other's separate existence in conducting business, thereby creating a single enterprise.

We must also keep in mind that section 187 applies only if the parties to be added as judgment debtors had control of the underlying litigation and were virtually represented. (See *Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd., supra,* 41 Cal.App.4th at p. 1555.) By definition, then, section 187 mandates that at least one alter ego individual or entity be a party to the earlier litigation. Here, Greenspan seeks to prove that Moti Shai, 6th St. Loft, and Harpro controlled the arbitration and were virtually represented through the individual who allegedly dominated them and directed the litigation on behalf of defendants: Barry Shy. Consequently, Shy's status as a party to the arbitration furthered the purpose of section 187 by meeting the control and virtual representation requirements as to the proposed judgment debtors.

Nor does public policy support the trial court's ruling. An arbitration or civil suit is intended to determine liability and damages on specified causes of action, not to resolve hypothetical problems the plaintiff might face in collecting on a judgment. In this case, Greenspan had no reason to name the Shy parties as defendants in the original suit. As a result, the discovery concerning alter ego issues, in the form of judgment debtor proceedings, occurred *after* the judgment was obtained. (See *Jogani v. Jogani* (2006) 141 Cal.App.4th 158, 172–174 [45 Cal.Rptr.3d 792] [discussing judgment debtor discovery]; Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2010) ¶¶ 6:1270 to 6:1335.1, pp. 6G-1 to 6G-22 (rev. # 1, 2007–2010) [same].) But under the trial court's reasoning, the plaintiff in every corporate contract case would be encouraged—regardless of the circumstances—to sue not only the corporation but also its owners and affiliated companies and then engage in *pretrial* discovery in an attempt to establish alter ego liability. This would promote a fishing expedition into alter ego evidence *before* the plaintiff obtained a favorable judgment, if at all. Thus, it may be prudent for a plaintiff to sue only the corporation. Should problems later arise in satisfying a judgment against the corporation, the plaintiff may resort to appropriate postjudgment proceedings (§§ 708.110–708.205), including section 187's procedure for adding judgment debtors. Of course, if before filing suit, the plaintiff reasonably believes that an alter ego relationship exists among various individuals and companies, the complaint should probably include alter ego allegations and name the alleged alter egos as defendants. (Cf. *Allied Fire Protection v. Diede Construction, Inc., supra,* 127 Cal.App.4th at p. 155.) In the present case, however, when the complaint was filed, Greenspan had no reason to suspect the existence of an alter ego relationship among Shy, the trustee, and the limited liability companies.

Thus, the trial court relied on the wrong reasons in denying the motion to add Barry Shy as a judgment debtor.

### D. *Alter Ego Doctrine and Trust Assets*

In denying the motion to add the trustee of the Shy Trust as a judgment debtor, the trial court remarked that no authority supported applying the alter ego doctrine in the trust context. In his opening brief on appeal, Greenspan states that, although there is no authority on point, courts should not distinguish between the domination of a corporation and the domination of a trust. For their part, the Shy parties, also without citation to authority, argue that the alter ego doctrine is limited to corporations. Based on a trio of California cases as well as out-of-state authority, we conclude the alter ego doctrine may apply to a trustee but not a trust.

In *Wood v. Elling Corp.* (1977) 20 Cal.3d 353 [142 Cal.Rptr. 696, 572 P.2d 755], the plaintiff brought suit against Walter and Cathryn Wencke, alleging the Wenckes had defaulted on a promissory note, had fraudulently transferred real property to two corporations, and had conveyed ownership of the corporations to two trusts created for the benefit of their children. The Wenckes were the trustees of the trusts. The plaintiff asserted that the corporations and the trusts were the alter egos of the Wenckes. (*Id.* at pp. 363–364.) The trial court sustained a demurrer to the complaint on the ground that the suit was barred by the statute of limitations, reasoning that the Wenckes had no ownership interest in the corporations. The Supreme Court agreed that the suit was time-barred but nevertheless reversed and remanded, stating: "In the circumstances of this case, . . . we believe that plaintiff should have been given the opportunity to further amend his complaint. If it were alleged and proven that the two trusts in question were *themselves* alter egos of the Wenckes, those trusts would essentially drop out as independent legal entities and the general allegations relating to interest and ownership [of the real property] would find support in . . . specific allegations presently appearing in the complaint." (*Id.* at p. 365.)

In *Torrey Pines Bank v. Hoffman* (1991) 231 Cal.App.3d 308 [282 Cal.Rptr. 354], the bank made a construction loan to a family trust for the purpose of building an apartment complex on undeveloped property owned by the trustees as individuals. The Hoffmans, a married couple, were the settlors of the trust and also served as its trustees and beneficiaries during their lifetimes with their issue as the ultimate beneficiaries. The trust document authorized the Hoffmans, as trustees, to bind the trust estate and to borrow money secured by trust property.

The bank issued a commitment letter, requiring the Hoffmans to provide personal guaranties to back the loan. At the time of signing the loan papers,

the Hoffmans transferred their individual interests in the property to the trust, and the trust borrowed $3.05 million by promissory note. As security, the Hoffmans executed a deed of trust on the property and an assignment of the construction contract. They each signed a personal guaranty of the loan that waived the protections of the antideficiency statute (§§ 580a–580d).[1]

The construction project did not go as planned. Structural cracks developed, an easement problem arose, and the apartments were difficult to rent due to noise and a lack of air conditioning. Eventually, the Hoffmans, as trustees, defaulted on the loan. The bank completed a nonjudicial foreclosure and filed suit against the Hoffmans, as guarantors, to recover the deficiency. The trial court entered judgment for the Hoffmans, finding they "were the alter egos of the trustees and principal obligors." (*Torrey Pines Bank v. Hoffman, supra*, 231 Cal.App.3d at p. 316.) The trial court concluded that "[because] the bank had proceeded under its power of sale clause to nonjudicially foreclose on the property, 'it [was] barred from pursuing a deficiency judgment against the Hoffmans . . . .' " (*Ibid.*)

The Court of Appeal affirmed, stating: "[T]hese guarantors, as persons who created, administered, and benefited from the trust, were the alter ego of the trustees as principal obligors." (*Torrey Pines Bank v. Hoffman, supra*, 231 Cal.App.3d at p. 316.) "It is well established that where a principal obligor purports to take on additional liability as a guarantor, nothing is added to the primary obligation . . . . The correct inquiry . . . is whether the purported debtor is anything other than an instrumentality used by the individuals who guaranteed the debtor's obligation, and whether such instrumentality actually removed the individuals from their status and obligations as debtors. . . . Put another way, are the supposed guarantors[, the Hoffmans,] nothing more than the principal obligors[, the trustees,] under another name?" (*Id.* at pp. 319–320, citations omitted.) "The evidence of this transaction as a whole demonstrates substantial identity between the individual guarantors and the debtor trustees. The bank was presented with substantially the same financial information for both the family trust and the individual guarantors as an inducement to make the loan. It had a copy of the family trust (the borrower) naming the Hoffmans, the settlors, as their own trustees and beneficiaries (along with their children). Although the guaranties were signed by the Hoffmans as individuals, the bank was well aware of their trust capacities, and should have been aware of the rules regarding the purpose, usefulness, and limitations on the inter vivos trust device." (*Id.* at p. 320.) "These trustees

---

[1] Section 580d provides: "No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property . . . hereafter executed in any case in which the real property . . . has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust."

were personally liable on the contract they entered into on behalf of the trust. There is a significant identity between these individuals and their inter vivos trust during their lifetimes, such that their trust should be deemed to be a 'mere instrumentality' . . . through which they operated, but which never served to remove them from the status of primary obligors. Accordingly, they must be considered to be primary obligors along with their trust." (*Id.* at p. 321, citation omitted.)

In *Morley v. Malouf* (1948) 88 Cal.App.2d 680 [200 P.2d 159], a real estate investor, Ben Marks, created a trust, naming himself the "manager," transferring deeds of trust to a "trustee," and designating a third individual as a "beneficiary." Without the trustee's consent, Marks transferred all of the trust's assets to third parties. The trustee later sued Marks for conversion but was unsuccessful. The trial court found, and we affirmed, that Marks had used the trust to market his real estate interests and that the trust was his alter ego. As a consequence, Marks had bound the trustee and the trust when he subsequently conveyed the assets to third parties. (*Id.* at pp. 687–691.)

As we explained: "The silence of the [trustee] upon the subject of knowledge or ratification of the acts of Marks assumes additional significance upon a review of the entire series of transactions. From the inception of the project, [Ben] Marks represented the . . . Trust. On behalf of the 'trust' he executed documents of far-reaching importance, without objection by the 'trustee' or 'beneficiary.' It was not until more than four years after the execution by Marks of the instrument [conveying the trust's assets to the third parties] that the [trustee] sought to recover the value of whatever Marks may have surrendered by that document. . . . [¶] We are convinced from an examination of the record that the trial court was amply justified in concluding that [the trust] was but the *alter ego* of Ben Marks; that this fact was known to all parties, and that therefore his authority to execute the 'forfeiture' instrument . . . cannot in this court be questioned." (*Morley v. Malouf, supra,* 88 Cal.App.2d at pp. 690–691; see Bogert & Hess, The Law of Trusts and Trustees (3d ed. 2007) § 46, p. 511, fn. 26 [discussing *Morley*].)

Courts in other jurisdictions also apply the alter ego doctrine to reach trust assets. "It is well settled that if an entity is the 'alter ego' of an individual, the assets of the entity may be determined to be the assets of the individual so that an injured individual may reach those assets to satisfy a claim. That is, the individual's creditors may reach property which ostensibly belongs to a third entity if that entity is the alter ego of the individual. . . . If an entity is so managed and controlled by an individual as to constitute a sole proprietorship, the entity is the alter ego of the individual. Although the doctrine is most often applied with regard to corporations, it also applies to trusts." (*In re*

*Gillespie* (Bankr. E.D.Ark. 2001) 269 B.R. 383, 388, citations omitted [applying Ark. law]; accord, *In re Schwarzkopf* (9th Cir. 2010) 626 F.3d 1032, pp. 1037–1040 [second of two trusts was alter ego of individual debtor where he created trust, transferred ownership of disputed property to trust, dominated trustee, and failed to document payments from trust] [applying Cal. law]; *Limbright v. Hofmeister* (E.D.Ky. 2010) 688 F.Supp.2d 679, 683, 686–688 [under Mich. law, alter ego doctrine may apply to trusts without finding of fraud as long as trust was used to commit a wrong]; *In re Maghazeh* (Bankr. E.D.N.Y. 2004) 310 B.R. 5, 19 [to apply alter ego doctrine under N.Y. law, it must be "established that the Debtor dominated and controlled the . . . Trust [and] . . . that the Debtor used his control of the . . . Trust to commit a wrongful act"]; *Dexia Credit Local v. Rogan* (N.D.Ill. 2009) 624 F.Supp.2d 970, 982–983 [under Ill. law, creditor may apply alter ego doctrine to children's trusts to reach assets of debtor father]; *Bracken v. Earl* (Tenn.Ct.App. 2000) 40 S.W.3d 499, 502–503 [under Tenn. law, manager of trust was trust's alter ego where he controlled all aspects of trust's operation, and trustees were not involved in trust's management].)

In short, "[t]he concept of personal liability for the obligations of an entity considered to be an alter ego of an individual is frequently employed in relation to corporations. . . . We see no reason why the alter ego concept should not have the same effect in the case of a trust." (*Vaughn v. Sexton* (8th Cir. 1992) 975 F.2d 498, 504, citations omitted.)

 Courts often speak of the alter ego doctrine as if it applied to a trust as an entity. But a distinction must be made between a trust and a trustee. "The general rule that a trust is a relationship is universally recognized by U.S. cases and statutes, and is consistent with the prevailing norms of the entire common-law world. The fundamental nature of this relationship is that one person holds legal title for the benefit of another person. Thus, 'in actuality, a trust is not a legal person which can own property or enter into contracts. . . . [I]t is the trustee or trustees who hold title to the assets that make up the trust estate and who enter into contracts necessary to the management of the estate, subject to fiduciary obligations to manage and use the assets for the benefit of the trust beneficiary.' Moreover, because '[a] trust is not a legal entity,' it 'cannot sue or be sued, but rather legal proceedings are properly directed at the trustee.' " (Nenno & Sullivan, *Planning and Defending Domestic Asset-Protection Trusts*, Planning Techniques for Large Estates (Apr. 26–30, 2010) SRO34 ALI-ABA 1825, 1869–1870, fns. omitted.)

 "Because a trust is not an entity, it's impossible for a trust to be anybody's alter ego. That's because alter ego theory, which is simply one of the grounds to 'pierce the corporate veil,' is inescapably linked to the notion

that one person or entity exercises undue control over another person or entity. However, a trust's status as a non-entity logically precludes a trust from being an alter ego." (Nenno & Sullivan, *Planning and Defending Domestic Asset-Protection Trusts*, Planning Techniques for Large Estates, *supra*, SRO34 ALI-ABA at p. 1870, fn. omitted.) But "[w]hile applying alter ego doctrine to trusts is conceptually unsound, applying the doctrine to *trustees* is a different proposition. Trustees are real persons, either natural or artificial, and, as a conceptual matter, it's entirely reasonable to ask whether a trustee is the alter ego of a defendant who made a transfer into [the] trust. Alter-ego doctrine can therefore provide a viable legal theory for creditors vis-à-vis trustees." (*Id.* at p. 1871, italics added.)

■ As recognized in California: " 'Unlike a corporation, a trust is not a legal entity. Legal title to property owned by a trust is held by the trustee . . . .' ' "A . . . trust . . . is simply a collection of assets and liabilities. As such, it has no capacity to sue or be sued, or to defend an action." ' " (*Stoltenberg v. Newman* (2009) 179 Cal.App.4th 287, 293 [101 Cal.Rptr.3d 606].) "[T]he proper procedure for one who wishes to ensure that trust property will be available to satisfy a judgment . . . [is to] sue the trustee in his or her representative capacity." (*Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1349 [7 Cal.Rptr.3d 178].)

■ Thus, in the present case, Greenspan properly sought to add Moti Shai, the trustee of the Shy Trust, as a judgment debtor. If Moti Shai is the alter ego of Barry Shy, then Barry may be considered the owner of the Shy Trust's assets for purposes of satisfying the judgment. The trial court erred in concluding that the alter ego doctrine could not be used to reach the assets of a trust.

## E. *Evidentiary Issues*

Although the Shy Trust did not object to Greenspan's evidence, the other Shy parties filed objections to 30 of Greenspan's 39 exhibits.

The trial court's cryptic ruling on the objections—"No. 28 is overruled; all others are sustained . . ."—is the type of ruling condemned in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 249–257 and footnote 7 [100 Cal.Rptr.3d 296], where the Court of Appeal said, "This is hardly a ruling, as it could not provide any meaningful basis for review" (*id.* at p. 255). Here, there were multiple objections to most exhibits. Lacking any guidance from the trial court, we must consider *every* objection to an exhibit, no matter how seemingly frivolous, to decide if *any* has merit.

Fortunately, the trial court's misapplication of a few evidentiary principles explains most of its errors. Put another way, we need reference but a few basic rules of evidence to explain the vast majority of the erroneous rulings. That makes it unnecessary to discuss the exhibits separately. Instead, we will set forth a correct statement of the law and, by doing so, indicate how the trial court abused its discretion by sustaining the same objections over and over again. (See *Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 762 [111 Cal.Rptr.3d 910]; *Nazir v. United Airlines, Inc., supra*, 178 Cal.App.4th at p. 255 & fn. 4.)

### 1. *Authentication*

As is routine in law and motion practice, most of Greenspan's exhibits were authenticated through declarations submitted by his attorneys, who had personal knowledge of how the Meieran Trust obtained the exhibits, how they had been identified, who had identified them, and their status as true and correct copies of the "originals." (See *The Luckman Partnership, Inc. v. Superior Court* (2010) 184 Cal.App.4th 30, 34–35 [108 Cal.Rptr.3d 606]; *Landale-Cameron Court, Inc. v. Ahonen* (2007) 155 Cal.App.4th 1401, 1405 & fn. 3, 1409 [66 Cal.Rptr.3d 776]; *Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 560 [88 Cal.Rptr.3d 363]; Evid. Code, § 1400 et seq.) Andrew Meieran also submitted a declaration authenticating a few exhibits. For example, deposition excerpts were attached to the moving papers and were authenticated by the attorneys who took the depositions. That is an acceptable means of authentication. (See *Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1526–1527 & fn. 3 [53 Cal.Rptr.3d 700].) The deposition excerpts also included the court reporter's signed certification page—an alternative method of authentication. (See Code Civ. Proc., § 273, subd. (a).) Documents subpoenaed from one of LADT's banks were authenticated by a declaration from the custodian of records. (See Evid. Code, §§ 1561–1562.) One bank exhibit was produced at Barry Shy's deposition and was authenticated during the deposition, as reported in a declaration submitted by the attorney who deposed Shy. And an LADT accounting summary prepared by Barry Shy was also identified in his deposition and by the attorney who took the deposition.

Similarly, an objection to the use of copies in lieu of originals was also improperly sustained. (See Evid. Code, §§ 1521, 1550, 1562.)

### 2. *Hearsay*

Barry Shy is a defendant in the case. Any statement, oral or written, made by him was admissible as to him under the hearsay exception for party

admissions. (See Evid. Code, § 1220.) That includes prior testimony, whether given in a deposition, during the arbitration hearing, in judgment debtor proceedings, or in another matter. And because Shy was the manager of 6th St. Loft and Harpro, his statements were admissible as to them under the exceptions for party or authorized admissions. (See *id.*, §§ 1220, 1222; *Moran v. Pittsburgh-Des Moines Steel Co.* (3d Cir. 1950) 183 F.2d 467, 472 [hearsay rule does not exclude "admissions made by an agent of a party when the agent's powers are broad enough to constitute him the general representative of the principal with broad managerial responsibilities"]; *Agha v. Rational Software Corp.* (D.Or. 2003) 252 F.Supp.2d 1074, 1081 [managers' statements admissible against corporate employer as admissions], affd. in part & revd. in part on other grounds (9th Cir. 2004) 97 Fed.Appx. 748, 749.) The hearsay exceptions for party and authorized admissions also apply to documents *prepared by* Shy, like the LADT accounting summary. (See *Reid Brothers Logging Co. v. Ketchikan Pulp Co.* (9th Cir. 1983) 699 F.2d 1292, 1306.)

Testimony by other Shy company employees was admissible as authorized admissions, whether in the form of declarations or depositions. (See Evid. Code, § 1222; *Hill v. F.R. Tripler & Co., Inc.* (S.D.N.Y. 1994) 868 F.Supp. 593, 597.) And if Shy relied on particular testimony or a document during the arbitration, manifesting his belief in the truth of it, Greenspan could subsequently rely on the same evidence as an adoptive admission. (See Evid. Code, § 1221; *Tracinda Corp. v. DaimlerChrysler AG* (D.Del. 2005) 362 F.Supp.2d 487, 500–501; *U.S. v. United Shoe Machinery Corp.* (D.Mass. 1950) 89 F.Supp. 349, 352, disapproved on another point as stated in *American Standard Inc. v. Pfizer Inc.* (Fed.Cir. 1987) 828 F.2d 734, 745–746.)

Third party deposition testimony—for example, the testimony of LADT's bank representatives—is admissible in a law and motion proceeding for the same reasons as a declaration. (See *Gatton v. A.P. Green Services, Inc.* (1998) 64 Cal.App.4th 688, 695–696 [75 Cal.Rptr.2d 523]; 6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 42, p. 464; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2010) ¶ 9:50, pp. 9(*l*)-28 to 9(*l*)-29 (rev. # 1, 2010); 8A Wright et al., Federal Practice and Procedure (3d ed. 2010) § 2142, p. 634 & fn. 19; *Hoover v. Switlik Parachute Co.* (9th Cir. 1981) 663 F.2d 964, 966–967; *Microsoft Corp. v. Very Competitive Computer Products* (N.D.Cal. 1987) 671 F.Supp. 1250, 1254, fn. 2.)

Bank records are admissible as business records. (See Evid. Code, §§ 1271, 1562; *U.S. v. Johnson* (9th Cir. 2002) 297 F.3d 845, 864, fn. 14.)

LADT's 2007 tax return, produced by Barry Shy at a deposition, was admissible as either an adoptive admission (see Evid. Code, § 1221), a party admission (see *id.*, § 1220), or an authorized admission (see *id.*, § 1222). (See, e.g., *Blodgett v. C.I.R.* (8th Cir. 2005) 394 F.3d 1030, 1040; *Warfield v. Byron* (5th Cir. 2006) 436 F.3d 551, 559; *Shenson v. Shenson* (1954) 124 Cal.App.2d 747, 751–752 [270 P.2d 896].)

### 3. *Notice*

The objecting parties also assert that Greenspan did not serve them with notice of third party depositions and a subpoena duces tecum. But even a cursory glance at the record shows that Greenspan served proper notice on the opposing parties' counsel by mail.

### 4. *Relevance*

The exhibits were relevant to show the relationship among LA ABC, LADT, and the Shy parties and to establish Barry Shy's disregard of their separate existence. One exhibit, the final arbitration award, was relevant to the issues raised by the trial court's ruling that Barry Shy could not be added as a judgment debtor because he had prevailed in the arbitration. The trial court properly took judicial notice of the arbitration award. (See Evid. Code, § 452, subd. (d).)

On a related point, a party cannot exclude his own interrogatory responses by claiming they are vague and ambiguous. That may be an appropriate objection to an interrogatory (cf. *Clement v. Alegre* (2009) 177 Cal.App.4th 1277, 1282–1285, 1287 [99 Cal.Rptr.3d 791]), but the responding party cannot exclude his interrogatory *response* by asserting, in essence, it is inadequate. If that objection had any merit, it would encourage parties to submit evasive responses which, in turn, would lead to more discovery motions.

### 5. *Lodging Deposition Transcripts*

Greenspan lodged the pertinent deposition transcripts with the trial court five business days before the hearing on the motion to amend the judgment. The Shy parties contend that was too late. Not so. First, the Shy parties cite no authority requiring that the transcripts be lodged at all, much less by a certain date. (Cf. Cal. Rules of Court, rule 3.1116(b) [obligating party to submit only "relevant pages of the transcript"]; § 2025.480, subd. (d) [discovery motion to compel answer to question asked at deposition requires lodging

of deposition transcript five days before hearing]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 10:164, p. 10-62 (rev. # 1, 2008) [in moving for summary judgment, party should attach relevant pages of deposition transcript as exhibit to declaration]; Super. Ct. L.A. County, Local Rules, rule 8.71 [requiring deposition transcripts to be lodged with trial court in connection with commencement of trial].) And second, assuming the transcripts were lodged untimely, the Shy parties fail to establish prejudice. They were able to obtain the transcripts directly from the court reporter and did not need to rely on the lodging of the transcripts with the trial court.

### 6. *Waiver of Challenge to Objections*

The Shy parties argue Greenspan cannot challenge their objections for the first time on appeal but was required to respond to the objections in the trial court initially. For instance, the Shy parties contend Greenspan had to raise any hearsay exceptions below or waive them. But that rule applies only to objections raised during a trial. (See, e.g., *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 282–283 [88 Cal.Rptr.3d 186] [plaintiffs' failure to raise hearsay exception in response to objection during trial waived right to challenge ruling on appeal]; Evid. Code, § 354.) There is no authority requiring a party in a law and motion matter to respond to evidentiary objections in the trial court or waive an appellate challenge to the trial court's rulings. By analogy, the summary judgment statute addresses the *making* and waiver of *objections* in the trial court (§ 437c, subds. (b)(5), (c), (d)), as do the related California Rules of Court, rules 3.1352 and 3.1354, but no authority suggests that *responses* to the objections must be made in the trial court to preserve them on appeal. (See generally *Reid v. Google* (2010) 50 Cal.4th 512, 522–527 [113 Cal.Rptr.3d 327, 235 P.3d 988].)

### 7. *Objections Properly Sustained*

The trial court did not err in sustaining two of the objections. First, a memorandum to Barry Shy from a law firm, discussing LADT's finances, was not subject to a hearsay exception cited by Greenspan. Second, Shy's prearbitration brief was not relevant in establishing any facts. The brief was mere argument, not evidence. (See *Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1378–1379 [122 Cal.Rptr.2d 204].)

### F. *Prejudicial Effect of Trial Court's Rulings*

Trial court error is prejudicial, warranting reversal, if in the absence of the error, the appealing party would have probably obtained a more favorable result. (See Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; Evid. Code,

§ 354; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Taylor v. Varga* (1995) 37 Cal.App.4th 750, 759, fn. 9 [43 Cal.Rptr.2d 904].) That is the situation here.

Assuming for the sake of argument that the trial court properly ruled on the evidentiary objections, the court's rejection of Greenspan's legal contentions (see pt. IIC. & D., *ante*) would necessitate a reversal to permit the court to evaluate the evidence under the correct legal standards.

But the trial court's erroneous evidentiary rulings leave no doubt about the disposition on appeal. Some of the excluded evidence includes the following. Shy is the manager of LADT, controls its bank accounts, and, in effect, runs its finances. LADT never maintained minutes.

As the manager of LA ABC, Shy is not sure if that company ever maintained "books" or "records," but if it did, the documents would be at his home. LA ABC never had any employees and never prepared a financial statement. Shy does not know if LA ABC ever had a bank account or paid any of its own bills. LA ABC's "payments" to the Meieran Trust under the Purchase Agreement were made by LADT.

The trustee of the Shy Trust is Barry's brother, Moti Shai. Although the Shy Trust owns LADT, LA ABC, and LABAR, Barry Shy, not Moti Shai, "make[s] most of the important decisions" for those companies. Barry Shy "sometime[s]" consults with the trustee, but "the trustee know[s] . . . the policy and intent, and go[es] in line with what . . . I'm doing."

On May 9, 2005, Barry Shy signed a check transferring $3,475,000 from LADT's bank account to the Shy Trust. He was not sure if the payment was a "reimbursement" or "distribution." The Shy Trust had advanced millions of dollars to LADT. Barry testified the May 9, 2005 transaction could have been approved by himself, Moti, *or* both. It follows that, on occasion, Barry alone made financial decisions for the trust. (See *Farrell v. Paulus* (1944) 309 Mich. 441 [15 N.W.2d 700, 704] [" 'As a general rule transactions between members of a family must be closely scrutinized when the rights of creditors are involved and when such transactions are accompanied by . . . badges of fraud[, such as an intent to hinder, delay, or defraud creditors,] a full explanation of the conveyance is required when it is challenged by an unsatisfied creditor . . . .' "].)

Barry Shy is also the manager of 6th St. Loft and Harpro. Both are owned by the Shy Trust. Harpro's business address is Shy's home address.

In 2003, according to an accounting summary prepared by Shy, he deposited $179,000 in checks into LADT's account, indicating they were

"[c]ontributed by LABAR." But Shy admitted that all of the checks did not come from LABAR. He explained: "[I]f the source of the fund came from . . . Barry Shy or from Harpro or from LADT, it's all irrelevant, you know."

When Greenspan learned that LADT's $47 million in receipts on condominium sales had fallen to less than $13,000, he pursued judgment debtor proceedings to investigate LADT's expenditures and transfers. Greenspan learned that in March and April 2005, Shy made two transfers from LADT's accounts totaling $9 million, but, at his deposition, Shy could not explain where the funds went. With respect to other transactions, bank records and the testimony of a California National Bank representative revealed that Shy transferred over $2 million from LADT's bank accounts to his personal accounts: $1.25 million to open a certificate of deposit and a $1 million debit with "Barry" written beside it.

Bank representatives also testified Shy transferred millions from LADT's account to Harpro's account. While LADT was created to renovate the Higgins Building in downtown Los Angeles, Harpro operated a small shopping center in Van Nuys.

On another occasion, LADT transferred $3.02 million to a third party (Bolour Trust #2), supposedly on behalf of 6th St. Loft, but Shy characterized the transaction as funds "paid to BR Shy Trust as a distribution."

Although the foregoing evidence was not considered by the trial court, we note that other pertinent evidence *was* admitted. For instance, Shy admitted he would put money into and take money out of LADT accounts for personal use by writing a check to himself and would, from time to time, reconcile the amounts. And at Moti Shai's deposition as trustee of the Shy Trust, Moti answered "I don't know" to a series of questions concerning whether the trust had an accountant, whether it kept any type of financial ledger reflecting money received, whether it received any funds from LADT, whether anyone other than the trustee had written a check on the trust's behalf, and whether the trust had paid anyone for working. Barry never told Moti he was sending money from LADT to the Shy Trust.

In sum, the trial court incorrectly decided almost every issue in this case, save the sustaining of two objections and taking judicial notice of some court documents. As a result, the trial court misapplied section 187 and the alter ego doctrine and considered very little of Greenspan's admissible evidence. The prejudicial result is patent. We therefore reverse the order denying the motion to amend the judgment.

## III

## DISPOSITION

The order is reversed. Appellant is entitled to costs on appeal.

Rothschild, J., and Johnson, J., concurred.

A petition for a rehearing was denied January 19, 2011, and respondents' petition for review by the Supreme Court was denied April 13, 2011, S190489.