Filed 6/27/24  Triton Pacific Capital Partners v. Cenegenics CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| TRITON PACIFIC CAPITAL PARTNERS, LLC,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>CENEGENICS, LLC, et al.,<br><br>        Defendants and Respondents. | B328247<br><br>(Los Angeles County Super.  Ct. No. 18STCV03423) |

APPEAL from an order of the Superior Court of Los Angeles County, Kevin C. Brazile, Judge.  Affirmed.

Chora Young & Manasserian, Paul P. Young, Joseph Chora and Armen Manasserian for Plaintiff and Appellant.

Goe Forsythe & Hodges, Ronald S. Hodges and Mike D. Neue for Defendants and Respondents.

Plaintiff and appellant Triton Pacific Capital Partners, LLC, appeals from a post-judgment order denying motions to amend the judgment to add Kristy Berry and BestLife Holdings, Inc. (BestLife)[1] as judgment debtors. On appeal, Triton contends the trial court abused its discretion because: (1) the court's order did not expressly discuss certain alter ego factors and did not weigh the factors in favor of Triton; (2) the order did not expressly discuss Triton's equitable theory based on principles expressed in *Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP* (2012) 212 Cal.App.4th 1181 (*Carolina Casualty*); and (3) the trial court misunderstood and misapplied the legal standard for determining successor liability following a foreclosure. We conclude no abuse of discretion has been shown, and therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Founding and Financial Condition of Cenegenics

In 1997, John Adams and Alan Mintz founded Cenegenics, LLC (Cenegenics), to provide age management services to patients. Cenegenics hired Kristy Berry as a patient services associate in 1999. After a series of promotions, Berry became the chief operating officer of Cenegenics in 2005.

In 2012, the company's financial condition began to decline. Cenegenics entered into a credit agreement in September 2013,

---

[1] BestLife Holdings, Inc., was originally formed as a limited liability company and later converted to a corporation. The entities are collectively referred to herein as BestLife.

which was amended and restated in February 2016 (the Oaktree loan), providing Cenegenics with a term loan of $33,500,000 and a revolving loan of $2 million from Oaktree Specialty Lending Corporation, formerly known as Fifth Street Finance Corp. The Oaktree loan was secured by certain collateral, including Cenegenics' accounts, equipment, and intellectual property.

In 2015, Berry was appointed to Cenegenics' board of managers, and in 2017, she became president of Cenegenics. As president and chief operating officer of Cenegenics, Berry oversaw the daily operations of the entire organization. Berry owned a 0.7 percent equity interest in Cenegenics. Adams continued to be the chief executive officer of Cenegenics. Adams, his trusts, and Mintz's trusts collectively owned 87.1 percent of the equity in Cenegenics.

Cenegenics' financial condition continued to decline each year. Cenegenics repeatedly failed to make payments on the Oaktree loan. Cenegenics attempted to restructure its debt, secure additional financing, or sell the company to prevent liquidation. Several companies expressed interest in purchasing Cenegenics. In June 2018, the private equity firm Triton executed an agreement requiring Cenegenics to reimburse up to $250,000 in expenses for due diligence. The following month, Triton provided a letter of intent to purchase Cenegenics for $20 million. The private investment firm ROCA Partners, LLC (ROCA) also considered purchasing Cenegenics, but learned the company was in financial distress, key earnings measures had declined, and Oaktree held a senior secured loan. Ultimately, no buyer agreed to purchase the company.

On November 2, 2018, Triton filed a breach of contract complaint against Cenegenics, alleging that Cenegenics failed to

reimburse the $250,000 fee for due diligence related to the potential purchase of the company.

In April 2019, Berry, in her position as chief operating officer, verified Cenegenics' responses to form interrogatories. In November 2019, Berry sat for her deposition. She testified about events underlying the litigation. Triton took the deposition of Adams as the person most knowledgeable about negotiations to acquire Cenegenics.

After declining to purchase Cenegenics, ROCA had begun negotiating with Oaktree to purchase the Oaktree loan. The balance owed on the Oaktree loan was approximately $42 million, but Cenegenics' earnings before interest, taxes, depreciation, and amortization were less than $3 million in 2019. At the end of January 2020, Oaktree agreed to sell the Oaktree loan to ROCA for $2 million.

ROCA formed AgeWell Partners, LLC (AgeWell) as the investment entity to acquire the Oaktree loan. On January 31, 2020, AgeWell purchased the Oaktree loan from Oaktree, including the security interest in Cenegenics' assets, for $2 million. The security interests were assigned through amended financing statements.

In March 2020, Berry resigned from Cenegenics' board of managers.

On March 20, 2020, Triton filed a motion for summary judgment in the breach of contract action.

**Foreclosure of the Oaktree Loan**

On May 5, 2020, AgeWell provided Cenegenics with a notice of default, acceleration of loan, and demand for immediate

4

payment, and an offer to accept the collateral in full satisfaction of debt.  The following day, Cenegenics acknowledged its default under the Oaktree loan and consented to AgeWell's offer to accept the collateral.  AgeWell formed BestLife on May 29, 2020.

Cenegenics filed an opposition to Triton's summary judgment motion.  After a hearing on June 30, 2020, the trial court granted Triton's motion for summary judgment.

In July 2020, Cenegenics transferred the collateral, including its intellectual property, to AgeWell.  Adams signed the transfer documents as chief executive officer on behalf of Cenegenics.  Cenegenics also executed a general assignment and bill of sale with AgeWell, transferring the collateral and specific assets to AgeWell in satisfaction of Cenegenics' obligations.  The general assignment and bill of sale expressly excluded several assets and liabilities.  It excluded stock and other equity interests in Cenegenics or any ownership interest in any Cenegenics subsidiary.  It also expressly excluded several liabilities, including contingent liability for litigation with Triton of more than $250,000.  Adams executed the general assignment on behalf of Cenegenics.

AgeWell contributed the assigned assets to BestLife in exchange for a $15 million promissory note and an equity interest in the company.  BestLife owns several health and wellness brands, including the brand Cenegenics (hereinafter the Brand), Outset Health, and Apricot.

In July 2020, Adams' position as chief executive officer of Cenegenics ended.  Cenegenics' headquarters was vacated during the foreclosure process.  BestLife extended employment offers to several of Cenegenics' former employees, but also hired new employees for the Brand, Outset Health, and Apricot.

BestLife appointed Carly Stockdale as the chief executive officer of BestLife, appointed Berry as chief executive officer of the Brand, and hired a management team. BestLife has a different corporate headquarters than Cenegenics, almost entirely different shareholders than Cenegenics (one shareholder named Rosalind Sullivan invested in both companies), and an almost entirely different executive team than Cenegenics (only Berry was a member of both executive teams). BestLife owns the brand name and certain assets that previously belonged to Cenegenics, but created a new company for the brand, including new banking relationships, payroll and 401k providers, tax and legal advisors, web architecture teams, marketing vendors, merchant processors, the logo for the brand, and a focus on all consumers rather than simply men.

On October 1, 2020, the trial court entered a written order granting Triton's summary judgment motion and a judgment awarding damages of $250,000 to Triton, plus prejudgment interest and costs. On October 6, 2020, Triton filed a motion seeking attorney fees of $874,028.75 and costs of $74,783.22.

On October 19, 2020, Cenegenic's attorneys filed a motion to be relieved as counsel on the ground that Cenegenics no longer had any assets to pay counsel, which the court granted.

A hearing was held on the unopposed motion for attorney fees on December 17, 2020. The trial court awarded attorney fees of $674,134.30 and costs of $29,745.25. The court subsequently entered an amended judgment in the amount of $977,427.25.

In July 2022, BestLife appointed Berry as chief executive officer of BestLife. Berry holds no ownership interest in BestLife, but has an option to purchase approximately 3 percent of the outstanding shares if she meets the vesting criteria.

Triton conducted discovery related to enforcement of the judgment. Berry declared that she did not control the litigation, did not retain the services of Cenegenics' attorneys, did not direct the filing of Cenegenics' pleadings, did not engage in settlement discussions, and did not actively participate in the underlying litigation.

## Motions to Amend the Judgment

On October 13, 2022, Triton filed a motion to amend the judgment to name Adams and Berry as judgment debtors. Triton argued that Adams and Berry were alter egos of Cenegenics, either under a traditional alter ego analysis or based on the equities, as discussed in *Carolina Casualty*, *supra*, 212 Cal.App.4th 1181.

Triton also filed a motion to amend the judgment to add BestLife as a judgment debtor as an alter ego or successor-in-interest of Cenegenics.

Adams died unexpectedly on November 1, 2022. Berry and BestLife each filed opposition pleadings. Triton filed replies. At the hearing on the motions to amend the judgment on February 10, 2023, Triton discussed application of the holding in *Carolina Casualty*. Triton also argued that Berry controlled the underlying action, knowing that Cenegenics would not be able to satisfy the judgment, and waited to inform Triton and the court until after entry of judgment. Berry was deposed in her role on behalf of Cenegenics, and she verified detailed discovery responses. Internal communications between Berry and Adams agreed on appearances for a mandatory settlement conference, which reflected their decisionmaking authority. Berry and

Adams had full control over the company and the litigation response. They opposed Triton's motion for summary judgment on behalf of Cenegenics.

In addition, Triton argued Berry and BestLife were liable under a traditional alter ego analysis, addressing each factor but acknowledging that alter ego was an equitable doctrine that required balancing factors. In addition, Triton argued that BestLife held itself out to be the same company as Cenegenics and was Cenegenics' successor-in-interest.

The attorney for Berry and BestLife argued there was no commonality of ownership; Berry had no obligation to capitalize Cenegenics and no ownership of BestLife. The Oaktree loan was properly foreclosed upon, and the holder of the secured debt was entitled to use the assets. BestLife did not control the litigation, as it did not even exist at the time of the litigation. The doctrine of successor liability did not apply, because the assets were not sold by Cenegenics and there was nothing improper about the foreclosure.

The trial court concluded that judgment could not be rendered with respect to Adams without serving the personal representative of his estate, a ruling which Triton has not challenged on appeal. BestLife was not a successor in interest to Cenegenics, because it was not a " 'mere continuation' " of Cenegenics. Cenegenics did not directly sell its assets to BestLife. Instead, a legitimate creditor of Cenegenics sold the debt to AgeWell, which foreclosed and transferred the assets to BestLife.

The trial court noted that the alter ego doctrine is a rationale for disregarding the corporation's separate legal existence. The court acknowledged the elements of alter ego

liability and listed the factors that courts have considered to make an alter ego determination, citing *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538–539. The court found Cenegenics had no significant assets because its assets were lost through foreclosure. Cenegenics' funds were not commingled with BestLife's funds, but rather, Cenegenics was stripped of its assets through foreclosure. It was Oaktree's prerogative to sell its note to AgeWell, and nothing indicated it was not an arms-length transaction. Although Cenegenics' assets ultimately moved to BestLife, it was not as a result of wrongful commingling.

The court found Berry was the president and chief operating officer of both companies and served on the boards of both companies at different times. More than 50 employees transitioned from Cenegenics to work for BestLife, including four high-influence employees. BestLife assumed Cenegenics' leases around the country and initially designated the same principal business location in Las Vegas before Cenegenics ceased to exist. BestLife employees were paid through Cenegenics' old bank account at one point.

The trial court concluded that although Triton presented a fair amount of evidence showing overlapping control, employees, and office locations, Triton failed to show a unity of interest by a preponderance of the evidence because the legal owners of Cenegenics and BestLife were substantially different, and Berry owned only 0.7 percent of Cenegenics. Adams, his trusts, his late co-founder Mintz had collectively owned 87.1 percent of the equity in Cenegenics, but none of them held any equity interest in BestLife. BestLife's equity was held primarily by AgeWell and new investors.

In addition, there was nothing wrongful about the sale of Cenegenics' debt and the 2020 foreclosure. The motions to amend the judgment were denied. Triton filed a timely notice of appeal from the February 10, 2023 order.

## DISCUSSION

### General Principles Concerning Amendment to Add Judgment Debtors

A trial court may amend a judgment to add additional judgment debtors. (Code Civ. Proc., § 187; *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 508 (*Greenspan*).) Amending a judgment to add alter ego judgment debtors is an equitable doctrine on the theory that the court is simply substituting the correct name of the real defendant. (*Greenspan, supra*, at p. 508.)

To prevail on a motion to add judgment debtors on an alter ego theory, the moving party must show: (1) unity of interest and ownership between the corporation and its equitable owner such that the separate personalities of the corporation and shareholder do not in reality exist; (2) the alter ego of the corporate entity had control of the litigation and was virtually represented in the lawsuit; and (3) recognizing the privilege of separate existence would sanction fraud, or promote injustice or bring about an inequitable result. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072–1073 (*Misik*).)

To determine whether there was unity of interest and ownership between the corporation and the purported alter ego, the trial court considers factors such as "the commingling of funds and assets of the two entities, identical equitable

ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other. [Citation.] 'No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied.' " (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1341–1342.)

With regard to control of the litigation, the nonparty must have conducted the litigation with a diligence corresponding to the risk of personal liability involved. (*NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 778–779 (*NEC Electronics*).) " 'Control of the litigation sufficient to overcome due process objections may consist of a combination of factors, usually including the financing of the litigation, the hiring of the attorneys, and control over the course of the litigation.' [Citation.] Clearly, some active defense of the underlying claim is contemplated. (*Minton v. Cavaney* (1961) 56 Cal.2d 576, 581.)" (*NEC Electronics*, *supra*, at p. 781.) It is not enough that a chief executive officer and sole shareholder of a corporation is "aware" of the litigation. (*Ibid.*)

## Standard of Review

A trial court's ruling on whether to amend a judgment to add a judgment debtor is reviewed for an abuse of discretion. (*Greenspan*, *supra*, 191 Cal.App.4th at p. 508; *Misik*, *supra*, 197 Cal.App.4th at pp. 1071–1072.) Under this standard, "we may reverse only if we conclude the trial court's decision is ' "so irrational or arbitrary that no reasonable person could agree with

it." ' [Citation.]" (*Mechling v. Asbestos Defendants* (2018) 29 Cal.App.5th 1241, 1249.)

The trial court's factual findings are reviewed for substantial evidence. (*Carolina Casualty, supra*, 212 Cal.App.4th at p. 1189.) "When conducting a substantial evidence review, we must review the entire record in the light most favorable to the prevailing party, resolve all conflicts in the evidence in favor of the ruling or judgment being reviewed, and indulge all reasonable inferences in support of the [trial] court's findings. [Citation.] The [trial] court's resolution of conflicts in the evidence and credibility assessments are binding on this court." (*Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1286–1287.) In other words, "[w]e do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the [ruling] in favor of the prevailing party." (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.)

"Normally, we must presume the trial court was aware of and understood the scope of its authority and discretion under the applicable law. [Citations.]" (*Barriga v. 99 Cents Only Stores LLC* (2020) 51 Cal.App.5th 299, 333–334 (*Barriga*).) If the record affirmatively shows that the trial court's determination was based on incorrect legal assumptions or improper criteria, it cannot be said that the court properly exercised its discretion, and we must remand to the trial court to exercise informed discretion with awareness of the applicable law and full scope of its discretion. (*Ibid.*)

## Application of Traditional Factors

Triton contends the trial court abused its discretion because it failed to discuss certain alter ego factors in its ruling and did not rule in favor of Triton. First, Triton has not affirmatively shown that the trial court misunderstood the applicable legal principles. Second, Triton has not shown that it was entitled to a ruling in its favor as a matter of law. No abuse of discretion has been shown.

### A. No Evidence Trial Court Failed to Apply Correct Law

We presume the trial court knew and properly applied the law absent evidence to the contrary. (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103 (*McDermott*).) Triton has not shown that the trial court misunderstood the scope of its authority. In fact, the trial court explicitly stated the correct standard and factors for an alter ego determination. The record does not show the trial court failed to consider and weigh any evidence. Triton has not shown that the trial court was required to make express findings in connection with a motion to amend the judgment or that the trial court misunderstood the applicable law. Consequently, we infer that the trial court made all favorable findings to support the court's decision.

### B. No Factor Dispositive

Triton has also not shown that the trial court was required to find Berry or BestLife to be the alter ego of Cenegenics as a matter of law based on the evidence. Triton admits the court expressly found certain alter ego factors in favor of Berry and BestLife, which were supported by substantial evidence, and that no factor is dispositive. Triton simply seeks to have this court reweigh the evidence, which would invade the province of the trial court. Although the trial court made statements in support of Triton's position in connection with discovery motions, the court was entitled to change its views after the evidence was fully developed and presented to the court. The trial court's exercise of its discretion by declining to add Berry or BestLife as alter ego judgment debtors was clearly within the bounds of reason under the circumstances in this case. We do not reweigh the evidence, and we conclude it was not an abuse of the trial court's discretion to refuse to amend the judgment under the circumstances of this case.

## Equity Does Not Require a Different Result

Triton contends the trial court abused its discretion by failing to expressly address Triton's equitable theory based on *Carolina Casualty*. Again, we presume the trial court understood its legal authority, and Triton has not affirmatively shown that the trial court misunderstood that authority. Triton provided extensive briefing and oral argument on its theory of liability based on the equitable principles expressed in *Carolina Casualty*.

Furthermore, we conclude the trial court did not abuse its discretion by denying Triton's motions to amend the judgment based on the principles of *Carolina Casualty*.

Even without meeting the requirements for alter ego liability, "an unnamed party may be included as a judgment debtor if 'the equities overwhelmingly favor' the amendment and it is necessary to prevent an injustice." (*Carolina Casualty*, *supra*, 212 Cal.App.4th at p. 1189.) In *Carolina Casualty*, an insurer sued Ross Law Group in May 2008 for reimbursement of amounts paid to settle a legal malpractice action. (*Id.* at p. 1184.) The insurer alleged that attorney Leonard Ross controlled both Ross Law Group and the entity that received the settlement payment. (*Ibid.*) Ross Law Group filed a cross-complaint seeking reimbursement of the portion of the settlement funds that it had paid. (*Id.* at p. 1185.) In December 2008, the parties filed cross-motions for summary judgment. (*Ibid.*) Ross Law Group stipulated that if the insurer prevailed on summary judgment, the insurer was entitled to judgment in the amount of $175,000, plus interest. (*Ibid.*) The trial court entered judgment in favor of the insurer, which was affirmed on appeal in April 2010. After that, Ross Law Group provided information that the company had dissolved and ceased operations in September 2006, before the malpractice complaint was filed, and the company had no assets. (*Id.* at pp. 1186–1187.) Under the circumstances, the trial court found attorney Ross actively participated in and controlled the litigation between the insurer and Ross Law Group. (*Id.* at pp. 1187–1188.) The trial court concluded equity justified amending the judgment to add attorney Ross as an alter ego of Ross Law Group based on his clear role in the underlying coverage dispute, his role in directing the reimbursement

litigation, permitting the reimbursement action to advance against a nonentity with no funds, and encouraging dispositive cross-motions for summary judgment. (*Id.* at pp. 1187–1188.) The appellate court affirmed the trial court's exercise of its discretion to amend the judgment, noting that Ross actively participated in and controlled the litigation and that his involvement was pervasive. (*Id.* at pp. 1192–1194.)

The facts of *Carolina Casualty* are readily distinguishable from the instant case. In *Carolina Casualty*, the entity that purported to litigate the reimbursement lawsuit had in fact ceased to operate as a limited liability partnership before the lawsuit was even filed, while the individual attorney actively directed and controlled the litigation. (*Id.* at p. 1194.) The appellate court affirmed the trial court's exercise of its discretion because the equities "overwhelmingly favored" amendment to prevent an injustice, even if all elements of alter ego had not been established.

In contrast, in this case, Cenegenics was an ongoing concern when Triton filed its breach of contract lawsuit and Cenegenics litigated the matter in its own defense. Although Cenegenics was in financial distress, it had not been dissolved and was not defunct during the litigation. After Triton filed its motion for summary judgment, AgeWell foreclosed on Cenegenics' assets, and after summary judgment was entered in favor of Triton, Cenegenics transferred its assets to AgeWell pursuant to the foreclosure proceedings and ceased to exist as an operating company. No litigation action was taken on behalf of Cenegenics after it ceased to exist, unlike in *Carolina Casualty* where all of the litigation, from filing a cross-complaint to a motion for summary judgment, took place in the company's name years after

16

the company had ceased to exist.  Under the facts of the present case, the trial court was not required to find Berry was the alter ego of Cenegenics as a matter of law, and we find no abuse of the court's discretion.

## Successor Liability

Triton contends the trial court misapplied the law concerning successor liability.  We conclude Triton failed to show the trial court misunderstood the legal authority, and the trial court's findings are supported by substantial evidence.

A corporation purchasing the principal assets of another corporation does not assume the seller's liabilities unless "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts."  (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28.)

However, "a mere continuation contemplates a direct sale of assets from the predecessor corporation to the successor corporation, not a sale from a creditor of the predecessor corporation which has taken over its assets."  (*Maloney v. American Pharmaceutical Co.* (1988) 207 Cal.App.3d 282, 288, fn. omitted.)

Because of the factual and equitable nature of the successor liability doctrine, no single factual element, standing alone, establishes or negates successor liability as a matter of law. (*Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1334.)  "The significant principle is that ' "if a corporation organizes another

17

corporation with practically the same shareholders and directors, transfers all the assets but does not pay all the first corporation's debts, and continues to carry on the same business, the separate entities may be disregarded and the new corporation held liable for the obligations of the old." ' [Citation.] Whether that has happened depends on all the facts and circumstances." (*Ibid*.)

Triton contends the trial court misunderstood the legal standard for successor liability because the court required Triton to show there was "inadequate consideration" for BestLife's acquisition of Cenegenics' assets. Triton's interpretation of the trial court's ruling, however, is simply incorrect. The trial court's ruling was not based on whether there was inadequate consideration. The court concluded that BestLife did not purchase the assets from Cenegenics through a direct sale. BestLife was not a successor in interest to Cenegenics because it acquired the assets as a result of the secured creditor's legitimate foreclosure proceedings.

The trial court's finding that BestLife is not a "mere continuation" of Cenegenics is supported by substantial evidence. There was no direct sale of assets by Cenegenics to ROCA or AgeWell or BestLife. Oaktree was a legitimate creditor of Cenegenics. AgeWell purchased the secured loan from Oaktree for valuable consideration and rightfully foreclosed on the security. AgeWell's use of the assets after foreclosure through BestLife to maximize their value, including employing personnel with expertise in the business, did not constitute a mere continuation of the prior company. The trial court did not abuse its discretion by denying the motion to amend the judgment to add BestLife as a successor in interest to Cenegenics.

## DISPOSITION

The order denying the motions to amend the judgment is affirmed. Respondents Kristy Berry and BestLife Holdings, Inc., are awarded their costs on appeal.

NOT TO BE PUBLISHED.


MOOR, Acting, P. J.


We concur:



KIM, J.



LEE, J.*

---

\* Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.